(No. 12368.—Reversed and remanded.)

NANNIE MILES, Plaintiff in Error, *vs.* THE INTERNATIONAL HOTEL COMPANY, Defendant in Error.

*Opinion filed October 27, 1919.*

1. BAILMENTS—*when innkeeper is gratuitous bailee.* Where a boarder pays her bill upon leaving a hotel, and, according to her testimony, leaves her trunk for storage with the consent of the hotel keeper but without taking a check for it, the hotel keeper is a gratuitous bailee of the trunk, and the inducement of having the boarder return to the hotel is not such compensation as will make the bailment one of hire.

2. SAME—*degree of care required of a gratuitous bailee.* A gratuitous bailee is bound to take such care in the preservation of the property intrusted to him as every prudent man takes of his own goods of like character.

3. SAME—*what is meant by ordinary diligence.* Ordinary diligence means that degree of care, attention or exertion which, under the circumstances, a man of ordinary prudence and discretion would use in reference to the particular thing were it his own property.

4. SAME—*bailor must prove negligence of the bailee.* Although the bailor, by showing that the goods were received in good condition and not returned by the bailee, makes out a *prima facie* case, if the bailee offers evidence tending to show that he was not negligent the burden is still on the bailor to show that the bailee was, in fact, negligent and that his negligence caused the loss or contributed thereto.

5. APPEALS AND ERRORS—*when Appellate Court should recite finding of facts in its judgment.* Under section 120 of the Practice act, when the judgment of the trial court is reversed in the Appellate Court on a question of fact the ultimate facts found by the Appellate Court must be recited in the final judgment of that court, but if the judgment of the trial court is reversed for errors of law the Appellate Court should remand the case for another trial.

WRIT OF ERROR to the Second Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. CLINTON F. IRWIN, Judge, presiding.

THOMAS D. NASH, and MICHAEL J. AHERN, for plaintiff in error.

A. G. DICUS, for defendant in error.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

This cause is brought to this court by *certiorari* to review a judgment of the Appellate Court for the First District reversing a judgment of the superior court for $1097 in favor of Nannie Miles and against the International Hotel Company, proprietor of the Kaiserhof Hotel, in the city of Chicago. The judgment is for the value of a trunk and its contents claimed by plaintiff in error to have been lost by defendant in error.

According to the testimony of the plaintiff in error she came to the Kaiserhof Hotel on November 30, 1904, and registered as a guest of the hotel. She asked for special terms and was assigned room 301 at a dollar a day. She brought with her a trunk, suit-case and a parrot in a cage and stayed six months. When she went away, May 29, 1905, she called a bell-boy and requested him to ascertain if she could leave her trunk and what the charges would be. He inquired of the clerk and reported to her that they would gladly take care of her trunk and that there would be no charges. She first spoke to Miss Burke, the housekeeper, about leaving her trunk, and Miss Burke told her to make arrangements with the head porter. She had no conversation with the porter until her return, in March, 1906. Upon her return she registered and asked to have her trunk sent up. The next day she inquired of the porter why the trunk had not been sent up, and he said that it was Saturday and therefore a very busy day, but he assured her that he would send it up. On Monday she inquired about her trunk, and the head porter told her that in making some alterations in the building he thought perhaps her trunk had been misplaced. On Tuesday she complained to Max Teich, one of the managers, regarding her

trunk, and he asked her if she had a check for it, and she replied that she had not because she left hurriedly and did not ask for a check. Teich went over the building with her, searching for the trunk. There was a trunk standing outside the linen room which trunk resembled hers, but it belonged to the assistant housekeeper. She further testified that Teich told her that Miss Nelson, the cashier, remembered that she had put the duplicate check in an envelope, sealed it and put it in the safe and had given the porter the corresponding check; that Teich held a check in his hand while he was telling her this, but he did not let her see it; that Teich told her that Miss Burke told him that Mr. Clark took the trunk from her room. The parrot cage was found in the baggage room. She described the trunk as one with an oval top, covered with imitation leather, and as being three and a half feet long, three feet high in the middle and two and a half feet wide, and of the value of $14. She further testified that this trunk contained the following articles and fixed the values set opposite each article: Black silk waist, $10; white silk waist, $5; waist pattern, $4; silk lace waist, $18; blue silk waist, $13.60; two tailor-made dress skirts, $25; broadcloth wrap, $32; silk and wool shawl, $28; three-piece tailored suit, $39.50; two silk crepe shawls, $24; sealskin coat, $380; black silk tea gown, $27; wool tea gown, $17; twelve yards clay suiting, $42; fifty yards black silk, $125; nine yards blue silk, $40.50; eighteen yards brown silk taffeta, $18; three bolts white silk lace, $36; six yards black lace, $6; two bolts linen lace, $6; six yards Axminster trimming, $7.50; one dozen jade ornaments, $7.20; three yards black silk velvet, $15; three bolts black grosgrain ribbon, $14.40; twleve yards lawn, $4.80; two tablecloths, $7; two dozen napkins, $4.50; bed-spread, $6; violin bow, $4; piece of fancywork, $37; two brushes, $2; silk table scarf, $12; pair of steel glasses, $12; shoes, $4; slippers, $3; silk petticoat, $12; silk velvet hat, $12; eighteen buttons, $18;

tortoise shell purse, $7.50; sword, $5; hair switch, $7. The sealskin coat was bought by her husband in 1879 and was twenty-four years old when she left it at the Kaiserhof Hotel. She fixed the above value because at one time a furrier told her it was worth $300 and she paid him $80 to remodel it, and it was therefore worth $380. The clay suiting was procured by her from her husband's store when he closed out his tailoring business. It was six or eight years old at the time she left it in the trunk. She fixed the market value of this suiting at $42 because she saw the ticket on the goods. The fifty yards of black silk, the twelve yards of silk lace, the eleven bolts of linen net lace, the bolt of insertion, the three bolts of ribbon and the silk hat-brush were all given to her when her husband closed out his drygoods store, in 1884. The violin bow was fifteen years old. The trunk was twelve years old. She further testified that she paid the book-keeper at the office about two o'clock in the afternoon but did not tell her about leaving the trunk because she was not·sure that she was going that day. She had formerly conducted the Oneida Hotel, at Indianapolis, Indiana, and was familiar with the rules and regulations of hotels. She had been in a good many hotels and had left trunks but had never before left a trunk at a hotel without getting a check for it. She talked to no one about going away except the bell-boy. She left at seven o'clock P. M. There was a card hanging on the door of her room which stated that "all baggage and property of guests left with us in storage will receive our best attention, for which no charge will be made, but in case of accident by fire or water or damage of any kind it will be at the risk of the owner."

On behalf of the defendant in error Anna Burke testified that she had been the housekeeper for twenty-three years; that she knew the plaintiff in error and saw a parrot cage with a bird in it in her room and also an old trunk; that the plaintiff in error wore a wrapper about the hotel

and when she went out she wore a waist and skirt; that her trunk was invariably open, but that she never saw any silks or broadcloth or lace or bolts of goods in or around her trunk; that she saw her sealskin coat when she left it in the parlor and a watchman was taking it to the linen room; that it was worn on the sleeves and on the collar where the neck rubs against it, and was faded.

William Licht testified that he was the clerk who received Mrs. Miles and saw her make arrangements with Teich for a weekly rate; that Mrs. Miles paid him when she left, after six o'clock on the evening of May 29, 1905, and that she said nothing to him about her trunk; that the first he heard of the trunk was about a year later; that defendant in error had checks which were issued when baggage was left in charge of the hotel; that one check was fastened to the trunk and one check was given to the guest; that the baggage room was in the basement and was in charge of the head porter; that there had never been any complaints of loss of trunks or baggage; that all the porters and watchmen were reliable, capable employees, and that there had never been complaint of their work or of anything lost when intrusted to their care.

Miss Mary Burke, who had charge of the linen room, testified that she never saw Mrs. Miles wear any silks or satins but that she wore a dark skirt and white waist; that she often saw the sealskin coat hanging on the back of a chair in her room and that it was a very old coat; that she never saw any bolts of silk or dress goods in her room; that her trunk was a zinc trunk with an oval top, and that it was invariably open; that when Mrs. Miles was looking for her trunk with Teich she pointed out the trunk of the witness and said that it looked like hers but that the trunk of the witness was somewhat larger than that of plaintiff in error.

Augustina Korb (formerly Nelson) was the cashier and book-keeper at the hotel at the time Mrs. Miles lived there.

She testified that she did not tell Teich that she had taken a check and put it in an envelope with Mrs. Miles' name on it and put the envelope in a safe; that she did not place a check in an envelope for Mrs. Miles; that she never saw an envelope or check that was marked for Mrs. Miles; that she did not receive any pay from Mrs. Miles on the day she left; that the handwriting in the cash book showed that it was received by Licht, and that she never had any conversation with her with reference to leaving her trunk at the hotel.

Max Teich, treasurer and one of the managers of the hotel, testified that he was in the hotel November 30, 1904, when Mrs. Miles came in; that she told him that she had been in the hotel business and wanted to stay some time in Chicago and wanted a special rate; that they selected room 301,—a $1.50 room,—and made arrangements for her to stay at a special rate of $7 a week; that he wrote her name on the register; that she stayed until May 29, 1905, and in March, 1906, returned and came to him and wanted to get a trunk; that he asked her if she had a check, and she replied, "No;" that he asked her how she could leave a trunk without getting a check, and she replied that she left in a hurry; that she then asked him to help her make a search for it; that they made a search but found no trunk without a check, except one belonging to one of the porters; that he went with her to the linen room and there found a trunk which she said looked like her trunk but that her trunk was somewhat smaller than the one found; that he measured this trunk and found it to be two feet wide by three feet long and about two and one-half feet high; that they found the bird cage in the baggage room but it had no name or check on it; that he never told Mrs. Miles that Miss Nelson had told him that a check had been put in an envelope with Mrs. Miles' name on it and put in the safe; that there was no check in the safe; that the baggage room was kept locked and was in

charge of the head porter; that the porters were all competent and trustworthy men; that he had never received any complaints during the years 1904, 1905 or 1906 regarding the honesty or competency of any of the day or night porters or of the clerks or cashier; that all of his help was employed with care; that references were required and that inquiries were made before the help was employed; that no baggage could be left at his hotel without a check being issued for it, and that there had never been any baggage stored at his hotel, to his knowledge, without the guest taking a check for it; that all checks were in duplicate and that one was attached to the baggage and one was given to the guest; that the checks had on them the name of the hotel and a number; that if Mrs. Miles took her trunk with her on the cab when she went to the depot no check would figure in the transaction; that the porter would then take the trunk down and place it on the cab with her and she would go away with it; that he did not have any check in his hand at any time when he was with Mrs. Miles looking for her trunk.

John Murray testified that he was head porter at the Kaiserhof and that he had charge of the baggage room in the hotel; that Mrs. Miles did not leave any trunk with him or any of his assistants when she left on the 29th of May, 1905; that she did not say anything to him about leaving a trunk and that no trunk of hers ever came to the baggage room; that he did not tell Mrs. Miles that her trunk had been misplaced; that in March, 1906, when she complained of the loss of her trunk, he asked for a description of it, and that she at first refused to give it but later gave him such a description; that there was a bird cage in the baggage room and that he knew it belonged to Mrs. Miles.

Richard R. Miles testified that he was the former husband of Mrs. Miles; that they were divorced ten years before; that she had but one sealskin coat, and that he bought

it for her from L. S. Ayres & Co. in 1879 and paid $288 for it; that he sold out his drygoods business in 1884 and that she took a lot of stuff out of the store at the time.

This is substantially all of the testimony that was received in this cause. The briefs filed in the cause afford little assistance in determining the real legal points involved.

It is not necessary to determine whether or not plaintiff in error was a guest or a mere lodger or boarder, because the relation terminated when the bill was paid and she left the hotel. The question presented, therefore, is that of the liability of an ordinary bailee. At least some of the terms of the bailment were fixed by the notice which was posted by defendant in error in the room of plaintiff in error. This notice informed plaintiff in error that property left with defendant in error for storage would receive its best attention, which attention could not mean less than ordinary care. This was a gratuitous bailment, even though it may be said that the contract of bailment entered into was done partly as an inducement to plaintiff in error to return to the hotel as a boarder. Such incidental advantage is not such compensation as is necessary to make the bailment one of hire. (*Bennett* v. *O'Brien,* 37 Ill. 250.) A gratuitous bailee of property is bound to take reasonable care to protect it from loss or damage. As bailee the defendant in error was bound to exercise such care and diligence in the preservation of the property intrusted to it as every prudent man takes of his own goods of like character. Ordinary diligence means that degree of care, attention or exertion which under the circumstances a man of ordinary prudence and discretion would use in reference to the particular thing were it his own property. (*Schaefer* v. *Safety Deposit Co.* 281 Ill. 43.) The weight of modern authority holds the rule to be that where the bailor has shown that the goods were received in good condition by the bailee and were not returned to the bailor on demand the bailor has made out a case of *prima facie*

negligence against the bailee, and the bailee must show that the loss or damage was caused without his fault. (*Cumins* v. *Wood*, 44 Ill. 416; *Schaefer* v. *Safety Deposit Co. supra.*) The effect of this rule is, not to shift the burden of proof from plaintiff to the defendant but simply the burden of proceeding: The bailor must in all instances prove that the bailee was negligent, but when she shows that the goods which she intrusted to the bailee's care were not delivered upon demand she has made out a *prima facie* case or created a presumption of negligence which the bailee may overcome by offering evidence to show that it was not negligent, and if it produces such evidence, the bailor, in order to make out her case, must show that the bailee was, in fact, negligent and that its negligence caused the loss or contributed thereto. It was held in *Sanborn* v. *Kimball*, 106 Me. 355, that the bailee has sufficiently exonerated himself from liability when he has shown that the cause of the loss was a mystery. In this case it is admitted by plaintiff in error that she did not get a check for her trunk and that she was away for a year, and during all that time she did not write to the defendant in error and advise it that she had left a trunk there and that she had left hurriedly and did not get a check for it. At least reasonable prudence on her part would demand that she furnish some information to the defendant in error regarding the baggage. The gratuitous bailee, where the bailment was for the benefit of the bailor, would be required to exercise no more care in keeping a piece of property for the bailor than it would exercise in the care of its own property of equal value. It cannot be presumed that defendant in error would expect an old trunk of the size of the one here in controversy, with its contents, to be worth over a thousand dollars. Plaintiff in error had the burden of showing what property she delivered to defendant in error and the value of this property. After she established her *prima facie* case, then the duty of defendant in error was

to show that it was not negligent in keeping this property, if it was ever intrusted to its care. Defendant in error insists that it never received this trunk for storage, and there is absolutely no evidence to show that it did so receive it, excepting the statement of plaintiff in error that she told a bell-boy that she wanted it placed in storage.

Defendant in error showed that it employed competent and trustworthy help to handle the baggage of its guests, and showed that it had a safe place in which to keep baggage if it was intrusted to its care. Under the circumstances shown by the evidence in this case it could not show more. There is no evidence whatever in the record that the employees of defendant in error were not competent and trustworthy employees, and yet the jury found, in answer to special interrogatories submitted to them, that the hotel did not employ competent or trustworthy employees. There is no evidence in the record to sustain such a finding.

While plaintiff in error makes no objection to the form of judgment entered by the Appellate Court, it is apparent from a reading of the opinion of the Appellate Court that the judgment of the superior court was reversed because the Appellate Court found the facts to be different from the facts found by the superior court. Section 120 of the Practice act, which provides for the Appellate Court reversing the trial court as the result, wholly or in part, of a finding of facts different from the finding of the trial court, makes it the duty of the Appellate Court to recite in its final judgment the facts as found. When the judgment of the trial court is reversed on a question of fact the ultimate facts found by the Appellate Court must be recited in the final judgment of that court. *Delta Bag Co.* v. *Kearns,* 253 Ill. 365.

The judgment of the Appellate Court is therefore reversed and the cause remanded to that court, with directions to recite the facts in its final order upon which the judgment of reversal is predicated, and if it shall still be of the opin-

ion that the final judgment should be entered in that court, to so enter it. If, however, said court reverses the judgment of the superior court for errors of law the Appellate Court will remand the case to the superior court for another trial. Leave is granted to withdraw the record filed here for the purpose of re-filing it in the Appellate Court.

*Reversed and remanded, with directions.*