**W.A. TAYLOR & CO., Plaintiff,**

v.

**GRISWOLD & BATEMAN WAREHOUSE CO., Quality Distribution Systems, Inc., Frank Pagone, Sr., Frank Pagone, Jr., and Joe Pagone, Defendants.**

**No. 88 C 7133.**

United States District Court,
N.D.Illinois, E.D.

Dec. 19, 1990.

**1262**

Mark A. Orloff, William P. Caputo, Altheimer & Gray, Chicago, Ill., for plaintiff.

Paul O. Watkiss, John J. McInerney, Leahy, Eisenberg & Fraenkel, Ltd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

W.A. Taylor & Co. ("Taylor") has sued Griswold & Bateman Warehouse Co. ("Griswold"), Quality Distribution Systems, Inc. ("Quality") and three of Quality's officers under various claims relating to the damage and destruction to Taylor's products stored at Quality's Copenhagen warehouse in Franklin Park, Illinois (the "Warehouse"). Count I of Taylor's most recent complaint (the "Complaint") charges Quality with negligence. Both Quality and Taylor now move for summary judgment on Count I under Fed.R.Civ.P. ("Rule") 56.[1] For the reasons set forth in this memorandum opinion and order, Taylor's motion is denied while Quality's is granted in part and denied in part.

---

1. This is only the latest chapter in the distressingly checkered history of this litigation, occasioned substantially though not entirely by the fact that counsel for Taylor seem to be making up their game plan as they go along. In mid-1989 this Court was called upon to produce what was then thought to be a comprehensive written opinion on the issues actually posed by the parties ("Opinion I," 719 F.Supp. 697). Following that there were other fits and starts, including the parties' filing of post-opinion motions purportedly seeking to "clarify" Opinion I—but really asking either for reconsideration of the conclusions that this Court had reached in Opinion I or for a decision on wholly new issues that had not been tendered by the original motions. At last the case reached the final pretrial order ("FPTO") and final pretrial conference stage at the end of January 1990 (ordinarily the prelude to a prompt trial), only to lapse back into the motion and briefing phase when (1) Taylor sought to enlarge the scope of the dispute dramatically and (2) Quality and its co-defendants advanced other summary judgment motions (see "Opinion II," 742 F.Supp. 1398 (N.D.Ill.1990)). And now, as the text indicates, still another roadblock has been mounted in the path of what this Court would normally schedule—a quick trial for total resolution of the parties' disputes. This opinion is intended to remove that roadblock.

Ordinarily a summary judgment motion calls for the recital of the facts that are not in dispute and the identification of any that are controverted (with the purpose of course of examining whether any of the latter are "genuine issues of material fact" in the Rule 56(c) sense—that is, are outcome-determinative). That was indeed the course that this Court had undertaken in the draft opinion it had initially prepared, but that will not be issued because of the problem next identified.

### Taylor's Count I

Count I of Taylor's Complaint puts forth a standard negligence claim:

17. Under common law and Ill.Rev.Stat. Ch. 111⅔, ¶ 131, Quality owed Taylor the duty to use reasonable care and diligence to protect Taylor's property, to maintain suitable premises to store the property and to not misrepresent the true identity of the warehouse owners and operators. Quality also owed Taylor the duty, pursuant to Ill.Rev.Stat. Ch. 26, § 7–204, to exercise such care in regard to Taylor's product as a reasonably careful person would exercise in like circumstances. Quality breached these duties in at least the following respects:

 a. it failed to take necessary and proper precautions to prevent the flooding which occurred in August 1987;

 b. it failed to undertake necessary and sufficient efforts, after the flooding, to salvage and reclaim Taylor's product;

 c. it conducted clean-up of the flooding in such a manner as to further damage Taylor's product;

 d. it conducted clean-up of the flooding in such a manner as to make it impossible to determine the extent of water damage to Taylor's product;

 e. it failed to timely notify Taylor of the damage to Taylor's product;

 f. it failed to take precautions to prevent substantial amounts of Taylor's product from being lost or stolen;

 g. it failed to disclose to Taylor that the warehouse was located in a flood plain; [2]

 h. it located the warehouse in a flood plain; and,

 i. it failed to inform Taylor of the true identity of the warehouse owners and operators and the fact that Griswold was not "affiliated" with Quality and was not involved in any way in the ownership or operation of the warehouse. [3]

18. As a direct and proximate result of Quality's negligence, Taylor suffered substantial damage.

Although it has been clear to both sides from the outset that Quality—a warehouseman—was the bailee of Taylor's stored products, it is equally clear that the claim as asserted in Count I undertakes the burden, incumbent on every negligence plaintiff in Illinois (and elsewhere), of Taylor's *proving* Quality's negligence.

■ But now on its Rule 56 motion Taylor has shifted gears from its own pleading, attempting to frame its claim instead in terms of a special brand of negligence law applicable to bailment relationships—under which Taylor asserts the burden is not its own to prove negligence, but is rather Quality's to prove its own freedom from negligence. Taylor's problem in that respect is a function of the familiar principle that a party's pleadings (and a fortiori the party's proof) cannot of course be amended

---

2. [Footnote by this Court] Both g. and h. are no longer at issue, because Taylor has agreed to waive its claim that the Warehouse was located in a flood plain, as that term is generally understood in the scientific community (FPTO Att. H). On another (and purely procedural) front, this opinion will hereafter refer to the subparagraphs in Complaint ¶ 17 by the use of parentheses (e.g., "Complaint ¶ 17(a)") rather than using the somewhat more awkward "Complaint ¶ 17.a." format.

3. [Footnote by this Court] That claim is also a non-issue, because Opinion I decided as a matter of law that Quality did not misrepresent itself (719 F.Supp. at 705) and, though Taylor then sought to reargue the matter; the issue is not listed by Taylor among the contested issues of law and fact in FPTO Att. B.

by its legal memoranda (see, e.g., *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir.1989) and *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)).

Under the special theory of recovery that Taylor now advances—abandoning its Complaint ¶ 17 allegations of specific negligence by Quality in favor of a presumed negligence approach—it must first make out a prima facie case so that the burden of proof switches to the bailee (Quality) to show its freedom from negligence (Illinois Code Comment Paragraph (b) to Ill.Rev. Stat. ch. 26, ¶ 7–403(1)(b) ("Code Comment"); *Allis–Chalmers Corp. v. Pekin Foundry & Mfg. Co.*, 31 Ill.App.3d 1005, 1007–08, 335 N.E.2d 97, 99–100 (3d Dist. 1975)). And in that respect *Mueller v. Soffer*, 160 Ill.App.3d 699, 704, 112 Ill.Dec. 589, 592, 513 N.E.2d 1198, 1201 (5th Dist. 1987) (citation omitted) states:

> In order properly to plead the existence of and the right to recovery under a bailment theory, the following elements must be alleged: an agreement, express or implied, to create a bailment; delivery of the property in good condition; acceptance of the items bailed by the bailee; and nonreturn or redelivery of the property in a damaged condition.

█ One component of Taylor's newly-asserted predicate for liability on Quality's part is thus Taylor's need both to plead and to *prove* that its goods were *delivered in good condition*. Taylor bears the burden of showing that in order to make out a prima facie case (Code Comment; *Miles v. International Hotel Co.*, 289 Ill. 320, 327–28, 124 N.E. 599, 602 (1919)).

█ Here Taylor is deficient not only in its *pleading* (for nowhere in Count I does it allege that the goods were delivered to Quality in good condition) but also in its Rule 56 *proof* (for it advances nothing whatever in support of that essential ingredient). Under *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) that is fatal to Taylor's summary judgment motion, and it spells success for Quality's motion as it bears on that theory of liability:

> Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

So much then for Taylor's newly-advanced theory—it has chosen its playing field in that respect, it has decided what proof it wished to tender on that score, and it has failed.[4] But Quality's cross-motion

---

4. This Court has had several occasions in the recent past to address the subject of a Rule 56 movant's duty to pursue summary judgment just as it would pursue judgment at a trial: putting its best evidentiary foot forward, holding nothing back and living (or dying) with the result (see, e.g., *Pine Top Ins. Co. v. Century Indemnity Co.*, 123 B.R. 287, 299–300 (N.D.Ill.1990) and cases cited there). It might remain fair to say that in the absence of a cross-motion for summary judgment "the risk to a Rule 56 movant

... of having held back evidence (if it had any) on critical issues that it failed to confront on its motion 'is not well defined' (*Teamsters [Local 287 Pension Trust] Fund [v. Angelos]*, 649 F.Supp. [1242,] 1252–53 [ (N.D.Ill.1986) ] and cases cited there)" (*Pine Top, id.*). But the plain teaching of the earlier-quoted passage from *Celotex* is that where both sides have staked their bets on summary judgment, they operate at their peril—it is a matter of "speak now or forever hold your peace."

for summary judgment has also targeted Taylor's Count I as it is pleaded—as a straightforward negligence claim—and this opinion turns to that claim.

On that score Taylor bears the burden of showing the classic elements of negligence under Illinois law. *Cunis v. Brennan*, 56 Ill.2d 372, 374, 308 N.E.2d 617, 618 (1974) (citation omitted) states those succinctly:[5]

> the existence of a duty owed by the defendant to the plaintiff, a breach of that duty and an injury proximately resulting from the breach.

■ As to the first element, the existence of a duty is a question of law to be decided by the trial court (*Homer v. Pabst Brewing Co.*, 806 F.2d 119, 121 (7th Cir. 1986), citing *Laufenberg v. Golab*, 108 Ill. App.3d 133, 63 Ill.Dec. 875, 438 N.E.2d 1238 (1st Dist.1982)). For that purpose *Lance v. Senior*, 36 Ill.2d 516, 518, 224 N.E.2d 231, 233 (1967) sets out a number of factors to be taken into account in addition to the foreseeability that defendant's conduct will result in harm to another:

> The likelihood of injury, the magnitude of the burden of guarding against it and the consequences of placing that burden upon the defendant....

■ All of those factors have already been weighed in favor of imposing a duty on a warehouseman to its customers. Both Illinois statutory law and the Taylor–Quality contract (a standard warehouseman's contract) impose a duty on Quality. And as for the general standard of conduct—an essential complement of any duty—Ill.Rev. Stat. ch. 26, ¶ 7–204(1) states:

> A warehouseman is liable for damages for loss of or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful man would exercise under like circum-

stances but unless otherwise agreed he is not liable for damages which could not have been avoided by the exercise of such care.

Here it was not "otherwise agreed"—indeed the "Liability and Limitation of Damages—Sec. 11" provision in the Taylor–Quality contract echoes that statutory standard:

> The warehouseman shall not be liable for any loss or injury to goods stored however caused unless such loss or injury resulted from the failure of the warehouseman to exercise care in regard to them as a reasonable careful man would exercise in like circumstances and warehouseman is not liable for damages which could not have been avoided by the exercise of such care.

Quality has admitted (Answer to Second Amended Complaint ¶ 17) that it is "subject to those duties imposed upon [Quality] by law." This Court of course finds that Quality owed Taylor the quoted general standard of care.

Quality argues that it is not under any duty to Taylor under the circumstances of this case because the unprecedented rainfall was not reasonably foreseeable[6] and because Quality does not have a duty to protect against such an unforeseeable event. But that misses the thrust of Taylor's claim for negligence—that the damage to its products occurred as a result of Quality's "fail[ure] to take reasonable steps to preserve and protect Taylor's goods from obvious threats once it became aware of the fact that water had accumulated and entered the warehouse" (P. Mem. in Opposition 1). If Taylor can indeed show that damage to its products was caused by Quality's negligence *after* the rainfall, Quality is liable for any consequent damage.[7]

---

5. *Cunis'* approach to the foreseeability issue appears no longer to represent Illinois law (see the extended discussion in *Nelson by Tatum v. Commonwealth Edison Co.*, 124 Ill.App.3d 655, 80 Ill.Dec. 401, 465 N.E.2d 513 (2d Dist.1984)), but that does not at all affect the quoted (and commonly-cited) legal analysis in *Cunis*.

6. This Court has already decided, on an earlier motion, that the rainfall was an unforeseeable event (see Opinion II at 1406).

7. Of course, to the extent that Quality labels the rainfall as an "act of God" and argues that it is not liable for injuries sustained as a result, that is an affirmative defense on which Quality bears the burden of proof. As such, it will be ad-

Next Taylor must prove a breach of Quality's duty. That poses the question as to what *particular* standard of conduct Quality should follow under the specific facts of this case. That is normally a question of fact. As Prosser and Keeton, *The Law of Torts* § 37, at 237 (5th ed. 1984) (footnote omitted) puts it:

> Since it is impossible to prescribe definite rules in advance for every combination of circumstances which may arise, the details of the standard must be filled in in each particular case. The question then is what the reasonable person would have done under the circumstances. Under our system of procedure, this question is to be determined in all doubtful cases by the jury, because the public insists that its conduct be judged in part by the man in the street rather than by lawyers, and the jury serves as a shock-absorber to cushion the impact of the law.

But the same treatise then qualifies that proposition by saying that the issue of the particular standard (whether defendant's particular conduct fell short of the general standard) may be taken from the factfinder if it is possible to say (*id.* at 237–38) (footnotes omitted):

> that the conduct of the individual clearly has or has not conformed to what the community requires, and that no reasonable jury could reach a contrary conclusion. The court must then direct a verdict for the plaintiff or for the defendant, or even set aside a verdict once rendered; or, if the evidence as to the facts is in conflict, instruct the jury as to the conclusion it must draw from a particular set of facts. Thus the court may rule that it is necessarily negligence to ... [giving several examples].

With that in mind, this opinion turns to Taylor's claims (Complaint ¶ 17, quoted at the outset of this opinion) to ascertain if there are indeed genuine issues of material fact as to Taylor's claims of breach of duty.[8]

■ As for Complaint ¶¶ 17(a) and (d), Taylor has not addressed either claim in its Rule 56 motions. In accordance with the earlier discussion of the *Celotex* principle, it has therefore not created a genuine issue of material fact as to those claims.[9] Quality is entitled to summary judgment there.

Next, Taylor supports its Complaint ¶ 17(b) claim with two factual assertions. Only one aspect of that claim survives.

■ First, Taylor says that Quality waited at least three full days after the rainfall before it began any efforts to attend to any goods in the warehouse. Quality does not dispute that factually. But Quality President Joe Pagone ("Joe") states that he attempted to drive to the Warehouse in a Chevy Blazer truck on the day of the rainfall and on the day after, but that the street leading to the Warehouse was flooded with approximately six feet of water (Joe Pagone Aff. ¶¶ 5, 6). Finally, three days after the rainfall (at 8 a.m. Monday, August 17, 1987) the flood waters had receded sufficiently for him to gain entrance to the Warehouse and to begin cleanup work that very day (*id.* ¶¶ 7, 10). Under those circumstances no reasonable juror could find that Quality should have begun its cleanup and protection activities while access to the Warehouse was virtually impossible. As a matter of law, then, Quality did not breach its duty to exercise the care that "a reasonably careful man would exercise under like circumstances" when it did not begin cleanup efforts for three days.

■ Taylor's other contention in support of Complaint ¶ 17(b) is that when Quality did begin its protection efforts, it focused entirely on the goods of another customer and did not begin efforts to attend to Taylor's goods until nearly one month after the rainfall, thus allowing Taylor's product to rust and mold. Initial perusal of Taylor's

dressed later in this opinion when the issue of proximate cause is discussed.

8. As nn. 2 and 3 reflect, Complaint ¶ 17(g), (h) and (i) are no longer in issue and need not be dealt with here.

9. As for Complaint ¶ 17(a), as n. 6 says, Opinion II at 1406 had already held that the extraordinary flood in this case was not a foreseeable event.

evidence reveals that it may have stretched the actual time period by relying on Quality's summaries of cleanup efforts (Taylor Ex. O) rather than on Taylor's own traffic manager Jack Deckert ("Deckert"). Deckert Aff. ¶ 26 says it was "at least two weeks" after the rainfall that Quality began efforts to save or protect Taylor's products. On Quality's part, it says that it attended to Yamaka China's products first because they constituted between ⅔ and 90% of the goods stored in the Warehouse and because, as Joe explains, a promotion between Yamaka China and Jewel Food was scheduled to begin August 24, 1987 so that those products needed to be shipped out of the Warehouse in a week (Joe Pagone Aff. ¶ 12). Joe also describes a Warehouse in chaotic disarray (*id.* ¶¶ 8, 9) and the need to spend 14 to 16 hour days cleaning up Yamaka China's products for the first week (*id.* ¶¶ 10, 11, 14, 15). In light of the imminence of trial (a subject dealt with at the end of this opinion), prudence suggests the submission to the factfinder (the trial jury) of the question whether Quality's failure to reach Taylor's products for at least two weeks fails to reflect the care that a "reasonably careful man would exercise under like circumstances." [10]

As for Taylor's Complaint ¶ 17(c) claim that Quality conducted its cleanup in such a manner as further to damage Taylor's product, Taylor again presents two supporting factual assertions. This time both must go to the jury.

First, Taylor says that Quality bulldozed Taylor's goods out of the Warehouse. There is a genuine issue of material fact as to whether any product was indeed bulldozed (as Opinion II at 1403 has already noted). Deckert says that when he was investigating the Warehouse on November 30, 1987, Quality's warehouse manager told him that "large quantities of Taylor product was [sic] bulldozed out the front door into trailers to make room for the clean up of Yamaka China" (Deckert Aff. ¶ 26). Furthermore, Joe states in reference to Yamaka China's products that as of a week

after the flood, "the most damaged product found at the bottom of the piles, had been carried or shovelled into trailers which were on hand at Quality" (Joe Pagone Aff. ¶ 21). Quality's officers deny either having personally used bulldozers on Taylor's products or having given orders to bulldoze or having any personal knowledge of bulldozing (Joe Pagone Aff. ¶¶ 6, 7; Frank Pagone, Sr. Aff. ¶¶ 6, 7; Frank Pagone, Jr. Aff. ¶¶ 6, 7). In any case, if Taylor proves that bulldozers were used, whether such use was chargeable to Quality and whether it was unreasonable under the circumstances are questions of fact best left to the jury.

Second, Taylor says that Quality made extensive use of forklifts, despite expert advice not to do so, in order to avoid damage to stored goods. Again there is a genuine issue of material fact as to the actual use of forklifts. Taylor's evidence is Quality's own insurance claim (Taylor Ex. O), which reflects that two forklift operators worked during the week of August 13 to 17, 1987 for a total of 107.5 hours. However, Joe says that he was told not to use forklifts (Joe Pagone Aff. ¶ 10) and he also goes on to describe how the separation and restacking of products were conducted by forming human chains from the floor to the top of the boxes (*id.* ¶ 11). Such conflicting evidence is enough to create a factual issue from either party's perspective. And even if it is found that forklifts were used on Taylor's products, use of forklifts cannot be said to be so inherently unreasonable as to constitute negligence as a matter of law. Hence, the forklift issue as to breach of duty must also go to the factfinder.

On Taylor's Complaint ¶ 17(e) claim that Quality did not timely notify Taylor of the damage to its product, Taylor says that it did not receive a damage report until after its own visit to the Warehouse in November 1987, so that it was deprived of an opportunity to take steps to protect its

---

**10.** Of course this Court would still retain the ability, if the jury were to find in Taylor's favor and that proved to be contrary to the manifest weight of the evidence as it plays out at trial, to take a second look at the issue on a post-trial motion.

goods. That scenario cannot qualify as either necessarily negligent (given that Taylor does not show that Quality should or could have had the information more quickly) or necessarily reasonable (given Quality's promise to provide the information promptly). That is a determination as to which reasonable minds may differ and is also best left to the jury.

But all of the discussion up to now has focused only on the first two of the three components of a negligence claim—the existence of a legal duty and its breach. Black-letter law on any tort claim teaches that Taylor must also prove a final element as to any products damaged due to flood-related negligence. Taylor must be able to show that Quality's letting Taylor's products sit for two weeks, its using bulldozers and forklifts and its not giving Taylor earlier notice were *proximate causes* of damage to Taylor's products.

*Ortiz v. City of Chicago*, 79 Ill.App.3d 902, 908, 35 Ill.Dec. 57, 62, 398 N.E.2d 1007, 1012 (1st Dist.1979) reconfirms the principle stated in *Neering v. Illinois Central Railroad*, 383 Ill. 366, 380–81, 50 N.E.2d 497 (1943) that:

> To be proximately caused by a defendant's negligence, an "injury must be the natural and probable result of the negligent act or omission and be of such a character as an ordinary prudent person ought to have foreseen as likely to occur as a result of the negligence, although it is not essential that the person charged with negligence should have foreseen the precise injury which resulted from his act."

Determinations of proximate cause are ordinarily left to the factfinder (*Davis v. Marathon Oil Co.*, 64 Ill.2d 380, 395, 1 Ill.Dec. 93, 100, 356 N.E.2d 93, 100 (1976); *Ortiz*, 79 Ill.App.3d at 907, 35 Ill.Dec. at 61, 398 N.E.2d at 1011). But "ordinarily" does not mean "always," and *Merlo v. Public Service Co. of Northern Illinois*, 381 Ill. 300, 318, 45 N.E.2d 665, 675 (1942) (citation omitted) holds that proximate cause becomes a question of law "when the facts are not only undisputed but are also such that there can be no difference in the judg-

ment of reasonable men as to the inferences to be drawn from them."

That is indeed the situation with respect to Quality's failure to notify Taylor of the damage. Taylor claims that had it known the extent of the damage it would have prevented further damage from occurring. But does that mean that failure to notify was a *cause* of the damage? Surely, if Quality was not being negligent in *other ways* with respect to Taylor's products and it did not notify Taylor of the damage caused by the flood, the failure to notify could not alone cause any damage to Taylor's products. Damage was not a "natural and probable" or a foreseeable result of lack of notification. It does not suffice to identify such failure as a possible cause because Taylor might have prevented further damage—that is pure speculation and stretches the notion of proximate cause too far (see *Cooter and Gell v. Hartmarx Corp.*, —— U.S. ——, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990), quoting Prosser and Keeton § 41, at 264). This Court is constrained to hold that the record creates no reasonable inference that any failure on Quality's part to notify Taylor of the extent of the damage was a proximate cause of any further damage.

 As for whether any of the remaining asserted breaches of duty under Complaint ¶¶ 17(b) and (c) (if found) proximately caused the damage to the products, it becomes necessary to examine Quality's "act of God" defense. Here is Quality's Fourth Affirmative Defense as pleaded in its Answer:

> On the date of loss alleged in the Complaint, rainfall in excess of nine inches (9″) fell in the area where the subject warehouse was located, and if the Plaintiff sustained injuries or damages, said injuries or damages resulted directly and proximately from an act of God.

Any such defense is narrow in scope (*Cachick v. United States*, 161 F.Supp 15, 19 (S.D.Ill.1958)):

> A loss or injury is due to an act of God when it is occasioned exclusively by natural causes such as could not be prevented by human care, skill and foresight.

Quality bears the burden of proving by a preponderance of the evidence (*Hoggatt v. Melin*, 29 Ill.App.2d 23, 32, 172 N.E.2d 389, 392 (3d Dist.1961)) that the rainfall was the proximate cause of the damage sustained by Taylor. As *Sandy v. Lake Street Elevated Railroad*, 235 Ill. 194, 202, 85 N.E. 300, 303 (1908) (citations omitted) teaches:

> If there is any intervening human agency which contributes to cause the damage it can not be considered as caused by an act of God.

Unquestionably a substantial amount of damage must have been due to the flood itself. When Joe entered the Warehouse for the first time three days after the flood (Joe Pagone Aff. ¶¶ 8, 9)

> I saw no stacks of palletized product, rather the product had all fallen into mounds blocking all of the aisles, covering all of the cleared area adjacent to the loading dock from which we shipped the product. All of the previously stacked product had fallen. I also observed the floor of the warehouse was damp and the bottom portion of the boxes of product that was visible were wet and crumpled, both the bottom layer of boxes showing a water line approximately 16 to 18 inches above the floor and the walls of the warehouse showed a similar line approximately 4 to 4½ feet from the ground level.

However, Deckert's own investigation of the damage on November 30, 1987 suggests that neglect after the flood might have led to further damage (Deckert Aff. ¶ 26):

> I observed a large amount of Taylor product in a damaged condition. This included product that was totally unsalable because of broken bottles or seals and product that was damaged but salvageable by the replacement of labels and repacking. A large amount of Taylor product was being kept in open boxes, with no cushioning against breakage as there normally should be, or loose on the floor. In many cases, different types of products had been put together in single containers. In addition, the presence of mold, rust and slime on Taylor product could only be accounted for by prolonged exposure to water.

What that means is that if a breach of duty is found by the factfinder, the existence of a genuine issue of material fact also demands submission to the factfinder of the added question whether the damage was due *entirely* to an act of God or was due to Quality's negligence.[11]

Finally this opinion turns to Complaint ¶ 17(f), which charges Quality with having failed to take precautions to prevent substantial amounts of Taylor's product from being lost or stolen.[12] Taylor seeks to support that claim with two factual assertions, but neither holds water.[13]

First, Taylor makes a point of the facts that Quality employed 35 day laborers to do cleanup work without using normal background screening or interviewing procedures and that Quality also allowed them to wander unsupervised with doors standing open, contrary to normal procedures. Second, Taylor says that Quality did not maintain a fully operable and continuous burglar alarm system after the rainfall and did not investigate at least 18 unexplained activations of the alarm when it was working.

But even if it is assumed that either or both of those matters reflected negligent conduct by Quality, Taylor has not managed to create a genuine issue of mate-

---

**11.** It is of course also within the factfinder's province to determine whether some reasonably ascertainable part of the damage stemmed from the act of God while the rest was caused by negligence.

**12.** That claim relates to mysteriously missing, not damaged, products. As such it is not related to the flood and cannot bring into play the act of God defense.

**13.** Up to now this Court has successfully fought the temptation to leaven the tedious resolution of the parties' prolonged bickering—something only hinted at but not adequately reflected by the three written opinions that have had to be issued (representing only the tip of the proverbial iceberg)—by resorting to the obvious terrible pun just used in the text. But with the finish line in sight (at least that is to be hoped), this Court's resistance has finally crumbled—and there it is.

rial fact as to the issue of proximate cause. It has not presented a shred of evidence—whether in the form of witnesses' testimony or burglary reports or the like, or in any other form—to show that the stated circumstances led to the theft of any of Taylor's product. It is not enough to identify a situation that might have created a risk without any proof whatever that the risk materialized and produced some harm. Only pure conjecture sustains Taylor's vision of causation, and that is not enough. That claim fails as a matter of law.

### Conclusion

In the sense dictated by *Celotex*, Taylor has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" in connection with Taylor's bailment-spawned concept of presumed negligence on Quality's part. That being so, *Celotex* dictates that there is no genuine issue as to any material fact, and Quality is entitled to a judgment as a matter of law on that claim. Taylor's claim in that respect is dismissed.

As for Taylor's Count I claim as actually pleaded, however—a claim of negligence to be proved by Taylor—Quality's effort to obtain a judgment as a matter of law is blocked by Taylor's identification of controverted factual issues that, if resolved in Taylor's favor by the trier of fact, could be outcome-determinative against Quality. Accordingly neither side's motion for summary judgment on that claim is granted, and the claim must go to trial.

This Court has no further patience for what seems to be a constant process of self-education on the part of Taylor's counsel as the case proceeds. Instead of the linear progression that a lawsuit should follow—in which the lawyer counsels with the client at the outset to learn the facts, then decides what legal principles apply to the disclosed facts, then files suit on that basis, then engages in the discovery needed to ready the case for trial and then tries the lawsuit—this case has moved amoeba-like in a random pattern, with "new" facts advanced from time to time, and with "new" legal theories advanced like the tentative probe of the amoeba in a different direction from its original path.

More than two years have elapsed since suit was filed, and more than ten months since the January 30, 1990 pretrial conference that was held to deal with the FPTO (as already indicated, that conference is the normal hallmark of the case being ready for trial on the very next day if the court's schedule would permit it). It is time to proceed to resolution. If further delays were countenanced, the past history of this litigation strongly suggests that Zeno's paradox would continue to operate: This arrow of a lawsuit would never reach its target of trial.

At this point a December 21 hearing is scheduled on Taylor's motion for reconsideration on its claim that another 3,474 cases of its goods are at issue. And as chance would have it, during the time that elapsed between the dictation of this opinion and its transcription this Court was compelled (because of the unanticipated unavailability of several criminal defense counsel, who are stuck in other ongoing trials that have extended far longer than anyone had expected) to vacate its long-ago-scheduled multi-defendant criminal antitrust trial that was due to begin January 2, 1991. That has created an opening into which this case will fit very comfortably.[14]

Accordingly:

1. This action is set for trial to begin at 9:30 a.m. January 3, 1991.

2. All parties are ordered to tender (a) their proposed voir dire questions for jury selection on or before December 27, 1990 and (b) their proposed jury instructions on or before January 3, 1991.

3. Trial briefs are waived.

---

14. As counsel for the parties are aware, this Court accords cases priority for trial based on the dates on which they reach the FPTO stage. This action is by far the most overripe case on this Court's calendar in those terms, so that the immediate setting provided for here carries out the principle of fairness in priority as well as blunting the effect of Zeno's paradox just described in the text.

4. All parties are directed to confer among themselves as to the most convenient alternatives for the scheduling of a pretrial conference to discuss trial procedures during the week of December 24, 1990 (when this Court has scheduled limited hearings in other cases, but no full-length trial). If possible, a conference telephone call should be placed by counsel at the earliest feasible date to discuss the scheduling of that pretrial conference; but at the latest such scheduling will be discussed at the time of the December 21 hearing.