**W.A. TAYLOR & CO., Plaintiff,**

v.

**GRISWOLD & BATEMAN WAREHOUSE CO., et al., Defendants.**

**No. 88 C 7133.**

United States District Court, N.D. Illinois, E.D.

July 21, 1989.

Mark A. Orloff, Alexander, Zalewa, Liss & Orloff, Ltd., Chicago, Ill., for plaintiff.

Paul O. Watkiss, Leahy & Eisenberg, Ltd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

W.A. Taylor & Co. ("Taylor") has sued Griswold & Bateman Warehouse Co. ("Griswold"), Quality Distribution Systems, Inc. ("Quality") and three of Quality's officers,[1] asserting claims arising from damage to Taylor's products stored at Quality's warehouse in Franklin Park, Illinois. All the Quality-related defendants have filed a motion seeking to resolve the issue whether the limitation on liability contained in various documents exchanged between the parties limits Quality's financial exposure

---

**1.** As the case caption reflects, Taylor also named "Quality Distribution/G & B of Illinois" as a party defendant. Because there is no legal enti-

in this lawsuit.[2] For the reasons stated in this memorandum opinion and order, this Court rules the liability limitation is effective except as to any goods Quality may be found to have converted to its own use.

### Facts [3]

Beginning in 1982 Taylor, a distributor of various brands of alcoholic beverages, stored its products in Griswold's warehouse (Taylor Mem. Ex. A ¶ 6). Taylor is an affiliate of Hiram Walker & Sons, Inc. ("Walker") (Quality Mem. Ex. A). On August 2, 1985 Walker and Griswold had signed a master contract governing their overall relationship (id.).

On August 12, 1986 Griswold President Patricia Corbett ("Corbett") wrote Taylor that Griswold would be "affiliating its Chicago operations with Quality" effective September 1 (Taylor Mem. Ex. B). In fact Griswold had entered into an agreement four days earlier (on August 8) under which Quality was to sublease the Franklin Park warehouse, with a license to use the name "Griswold & Bateman of Illinois" (Taylor Mem. Ex. C).

That change in the warehouse operation did not purport to affect the relationship with Taylor created by the 1985 Walker–Griswold contract. Six months later (February 12, 1987) Walker's Director of Administration Jim Reinhart ("Reinhart") sent Quality President Joe Pagone ("Pagone") a formal notice (as required by the 1985 contract) that Walker intended to cancel the master contract as of May 31, 1987 (Quality Mem. Ex. A). That however was not intended to signal an end to the relationship: Reinhart's letter also asked that Quality

send Taylor a new contract and Rate Quotation for review (id.).

In response, on February 16 Quality forwarded its proposal in Rate Quotation 00289 (id. Ex. B). Taylor General Traffic Manager Jack Deckert ("Deckert") replied with a counterproposal suggesting lower storage rates (id. Ex. C). Pagone accepted the new terms and on March 3 sent Taylor Rate Quotation 00272 reflecting Taylor's proposed (and now accepted) changes (id. Ex. D). Deckert forwarded the new Rate Quotation to Taylor's Legal Department for review (id. Ex. E), then (on March 16) sent Pagone a Panafax stating the Legal Department required one change in the contract: Sections 3(b) and (c) (relating to the transfer of goods and termination of storage) should be amended to require 30 days' advance notice by Quality (id. Ex. H). Again Quality agreed to Taylor's proposal and sent Rate Quotation 00729 reflecting that change (id. Ex. I).

Rate Quotation 00729 was thus the final contract between the parties. It contained a number of provisions now relevant:

1. Taylor's products not held in customs bond were stored at the rate of $.0715 per carton per month.

2. Taylor's products held in customs bond were stored at the rate of $.1715 per carton per month.

3. Quality's liability was limited in this manner:

Liability for loss or damage shall be limited to the actual value of the goods stored: and in no case shall the liability exceed 250 times the base storage rate unless an excess value is declared by the storer at the time the goods are stored. There will be a charge of $2/10$ of one per

---

ty bearing that name, it was dismissed from this action with prejudice on June 7, 1989.

**2.** Moving defendants filed a document labeled "Motion for Partial Summary Judgment." That of course was an incorrect label, for the motion clearly did not conform to Fed.R.Civ.P. ("Rule") 56(b): It did not seek judgment as to a discrete claim by Taylor or as to "any part thereof" in the sense defined by the Rule 56 case law. Although this Court could have denied the motion on that ground, it opted (as it could do as a matter of discretion) to treat the motion as one

for the narrowing of issues posed by the lawsuit (cf. Rule 16(c)).

**3.** Unlike Rule 56, Rule 16(c) contains no standards for viewing the factual presentations tendered by the parties in an effort to narrow issues. But as with Rule 56 motions, such issue-narrowing motions under Rule 16(c) can be useful only when no material factual disputes exist on those specific issues. Here no contested facts are material to the issue posed: whether the liability limitation is enforceable.

cent per month on the excess valuation in addition to the base storage rate.[4]

Whenever Taylor shipped any goods to the warehouse after that, it received by way of acknowledgement a warehouse receipt with this provision on the front (*id.* Ex. M, capitals in original):

The goods listed hereon were received in apparent good order, except as noted hereon (contents, conditions and quality unknown) subject to all terms and conditions on the reverse hereof. Such property to be delivered to THE DEPOSITOR upon payment of all storage, handling and other charges.

The property covered by this receipt has NOT been insured by warehouse operator for the benefit of the depositor against fire or any other casualty.

And this was one of the "terms and conditions on the reverse hereof" (emphasis in original):

Liability and Limitation of Damages—Sec. 11

(A) The warehouseman shall not be liable for any loss or injury to goods stored however caused unless such loss or injury resulted from the failure by the warehouseman to exercise such care in regard to them as a reasonably careful man would exercise under like circumstances and warehouseman is not liable for damages which could not have been avoided by the exercise of such care.

(B) Goods are not insured by warehouseman against loss or injury however caused.

(C) The depositor declares that damages are limited to *250 times the monthly storage rate* provided, however, that such liability may at the time of acceptance of this contract as provided in Section 1 be increased on part or all of the goods hereunder in which event a month-

ly charge of _____ will be made in addition to the regular monthly storage charge.[5]

On August 13–14, 1987 Quality's warehouse and the surrounding area were showered with an unprecedented rainfall—9.35 inches in all during an 18–hour period (*id.* Ex. L). That produced up to several feet of flooding throughout the area in which the warehouse was located. It flooded the warehouse (though not to the six-foot water level experienced elsewhere) and caused extensive damage to Taylor's products. Quality began its clean-up efforts on August 17 (Taylor Mem. Ex. L ¶ 10). Its first priority was to clear, separate and preserve the products of its largest customer, Yamaka China (*id.* ¶¶ 13, 16), which at that time accounted for between ⅔ and 90% of all products stored in the warehouse (*id.* ¶ 7).

On August 20 Quality notified Taylor that "we have experienced some water damage to your product," that it was in the process of checking those products and that it would notify Taylor of the results within two weeks (*id.* Ex. D). Taylor acknowledged receiving the letter and asked that results of the inspection be forwarded as soon as possible (*id.* Ex. E).

As of November 24, 1987 Taylor still had not received a report of the damage (*id.* Ex. F). Only after Taylor started receiving complaints from its customers did it launch its own investigation of the damage. According to the final tally, over 650 cases were completely missing and over 2,900 cases were either damaged or lost (*id.* Ex. A ¶ 27).

### Positions of the Parties

Quality says the liability limitation incorporated in final Rate Quotation 00729 and

---

4. [Footnote by this Court] Although this provision appeared on the front of the Rate Quotation in all capital letters, it is reproduced here in more conventional (and easier to read) upper and lower case format. Its substance also reappears (in almost identical language) as Section 10(a) of the contract terms on the back of the Rate Quotation—terms explicitly incorporated as part of the agreement by another clause on the front side.

5. [Footnote by this Court] Unlike the other material on the reverse side, this provision was in all capital letters, though it has been reproduced here in upper and lower case. As can be seen, it is substantially comparable (though not identical) to the previously-quoted provision of Rate Quotation 00729.

repeated in all the warehouse receipts limits Taylor's recovery here to 250 times the base storage rate. Quality asserts that at the time of the flood all Taylor's products were stored at the rate of $.0715 per case, so Quality's liability to Taylor can be no more than $17.875 per case.[6]

Taylor first responds the motion must be denied because Quality failed to comply with this District Court's General Rule 12(*l*). That non-issue will be addressed briefly in the text.

More importantly, Taylor says the liability limitation should not be enforced here for four separate reasons:

1. There is a factual question whether Taylor accepted that contract provision.

2. Quality has waived its right to rely on that clause.

3. Quality is estopped from enforcing the clause.

4. Quality converted Taylor's products to its own use.

Each of those arguments will be addressed in turn.

### General Rule 12(l)

■ This District Court's General Rule 12(*l*) requires a party moving for summary judgment to submit a statement of material facts as to which there are no genuine issues. General Rule 12(m) then requires the nonmovant to respond by admitting or controverting each paragraph of the movant's statement. Taylor Mem. 10–11 says Quality has not submitted the required statement and that General Rule 12(*l*) "mandates" a denial of the motion.[7] Even brief consideration shows Taylor to be wrong in two respects.

First, General Rule 12(*l*) does not "mandate" a dismissal for noncompliance. Rather it says:

> Failure to submit such a statement constitutes grounds for denial of the motion.

That language is clearly permissive in nature: Because both the origin and purpose of the rule are court-oriented rather than litigant-oriented,[8] it is the court that in its discretion may deny the motion for noncompliance but need not do so. In this instance the facts are sufficiently clear—and clearly undisputed—that failure to comply with the rule poses no problem. Nothing calls for denying the motion on that basis.

Moreover, it has already been pointed out that the current motion is being treated as an issue-narrowing one under Rule 16(c). By its literal terms General Rule 12(*l*) applies only to motions filed under Rule 56. This Court, in electing to entertain an issue-narrowing motion (a matter of discretion, while proper Rule 56 motions *must* be dealt with if litigants present them), might well require that the parties conform to the

---

**6.** Quality Mem. 9 rounds that figure downward to $17.87 per case.

**7.** Quality R. Mem. 1 contends it has complied with General Rule 12(*l*). While that issue need not be resolved in light of the discussion that follows in the text, Quality certainly has not conformed to one literal requirement of the rule: It submitted no statement consisting of short numbered paragraphs. That requirement, however, has as its obvious purpose the facilitation of the opposing party's General Rule 12(m) response on a paragraph-by-paragraph basis. As the following text reflects, the facts here (as distinct from their legal effect) are really undisputed.

**8.** As chance would have it, this Court was the initial proponent and draftsman of General Rules 12(*l*) and 12(m) as adopted in this District Court. No originality is claimed in that respect: This Court had earlier received, by transfer under 28 U.S.C. § 1404(a), a case from the Southern District of New York with a fully-briefed Rule 56 motion. As it developed, that court's Local Rule 3(g)—which ultimately served as the model for General Rules 12(*l*) and 12(m) here—proved the key to disposition of the motion (see *Keene Corp. v. Int'l Fidelity Ins. Co.,* 561 F.Supp. 656, 665 (N.D.Ill.1982), *adopted and aff'd,* 736 F.2d 388, 393 (7th Cir.1984)). This Court, convinced that such a rule would generally assist judges here in dealing with summary judgment motions by highlighting the presence or absence of genuine issues of material fact, commended the rule to its colleagues. All the judges here recognized that the rules' requirements do impose an extra burden on the litigants (though they also have the salutary effect of forcing them to direct their attention to the potential existence of disputed facts, perhaps heading off some ill-considered motions). But it was the unanimous view of the judges here that the benefits to the court substantially outweighed any such added effort.

same requirements to facilitate disposition of the motion—but it has not done so in this case. Thus Quality is not required to comply with General Rule 12(*l*) in any event.

In short, Taylor's arguments based on General Rule 12(*l*) are without merit. It is time to turn to the real issues in the case.

### Statutory Sanction of Liability Limitations

Illinois law[9] permits a warehouseman (such as Quality) to limit its liability for damages contractually. Ill.Rev.Stat. ch. 26, ¶ 7–204(2) ("Section 7–204(2)") provides:

> Damages may be limited by a term in the warehouse receipt or storage agreement limiting the amount of liability in case of loss or damage, and setting forth a specific liability per article or item, or value per unit of weight, beyond which the warehouseman shall not be liable; provided, however, that such liability may on written request of the bailor at the time of signing such storage agreement or within a reasonable time after receipt of the warehouse receipt be increased on part or all of the goods thereunder, in which event increased rates may be charged based on such increased valuation, but that no such increase shall be permitted contrary to a lawful limitation of liability contained in the warehouseman's tariff, if any. No such limitation is effective with respect to the warehouseman's liability for conversion to his own use.

Quality's liability limitation appeared in both the Rate Quotation (the "storage agreement") and the warehouse receipts. That makes the limitation effective unless:

1. Taylor can establish a defense precluding enforcement of the limitation, or

2. Quality converted the goods to its own use, so that the last sentence of Section 7–204(2) renders the limitation ineffective.

### Taylor's Agreement to Limited Liability

■ Taylor Mem. 22–24 says a factual dispute exists as to whether it agreed to the liability limitation. Not so.[10] Taylor was an active participant in the negotiations. After negotiating the desired storage rate, Deckert sent the contract to Taylor's Legal Department for review. Thereafter Taylor requested only one change: addition of a 30–day notice provision to Sections 3(b) and (c). It will not be heard to argue that it did not agree to the non-objected-to provisions, including the limitation on liability.

Taylor is thus reduced to the tenuous assertions that it did not sign the agreement and never discussed or negotiated its terms. Those contentions are quickly dismissed. First, its failure to sign the agreement is meaningless, for the Rate Quotation expressly says the act of shipping the goods constitutes acceptance of the terms. Taylor chose to ship the goods and hence accepted the terms.[11] Second, Taylor *did* negotiate the terms, as evidenced by the negotiation changes in Section 3. It is simply too late in the day for it to claim otherwise.

---

9. Both parties agree Illinois law applies (Taylor Mem. 11; Quality Mem. 6)—the obvious choice under the circumstances of this diversity case.

10. Because the facts involved in determining the existence of a contract are undisputed, this Court can make that determination as a matter of law (see, e.g., *Bank of Benton v. Cogdill,* 118 Ill.App.3d 280, 288, 73 Ill.Dec. 871, 876, 454 N.E.2d 1120, 1125 (5th Dist.1983)). Indeed, even under the authority cited by Taylor (*Construction Aggregates Corp. v. Hewitt–Robins, Inc.,* 404 F.2d 505 (7th Cir.1968)) this Court can decide the issue because "a reasonable man can determine the issue in only one way" (*id.* at 509). And even were that not so, the Illinois

rule of law would control this diversity case anyway.

11. Taylor Mem. 23 says shipment cannot "constitute acceptance when there is an ongoing relationship and the goods were being shipped routinely before, during and after the negotiations." Just what that is intended to mean is not at all clear, but it certainly has the ring of frivolousness. Not much imagination is required to guess what response would have been forthcoming from Taylor if, at some point after the parties had completed their negotiations, Quality had changed storage rates in midstream, claiming it was free to do so because the Rate Quotation was unsigned.

■ Furthermore, the warehouse receipts also contained the liability limitation—also all in capital letters. As the earlier-quoted language reflects, the front side of the receipt referred Taylor to the limitation on the reverse side. That provides sufficient notice under Illinois law (cf. *Strom Int'l, Ltd. v. Spar Warehouse and Distributors, Inc.*, 69 Ill.App.3d 696, 702–03, 26 Ill.Dec. 484, 489, 388 N.E.2d 108, 113 (1st Dist.1979)).[12]

In sum, the liability limitation was an integral part of the Taylor–Quality relationship. Taylor knew about the limitation but never once objected. Now, when that provision works a perceived hardship on Taylor, when the shoe pinches, it squeals. Nothing justifies such post hoc efforts to contend it never agreed to the term.[13] There is neither substance nor merit to those efforts. Taylor unquestionably agreed to and is bound by the liability limitation.

*Quality's Non–Waiver of Enforceability*

■ Taylor Mem. 11–12 says Quality waived its right to enforce the liability limitation because it had "a frequent and uncontradicted practice of paying all claims for missing or damaged product at the product's full value and far in excess of even five hundred times the monthly storage rate." Deckert Aff. ¶ 15 (Taylor Mem. Ex. A) identifies seven instances of the

asserted full payment of losses despite the limitation.

Quality R. Mem. [7–8][14] says it has never waived the limitation and in fact has never paid any claim made by Taylor. Quality notes that five of the seven instances involved claims at Griswold's Elizabeth, New Jersey warehouse (Deckert Aff. ¶¶ 15(a), (c), (e), (f) and (g)). Quality does not even have a warehouse in New Jersey. The other two claims (Deckert Aff. ¶¶ 15(b) and (d)) were both made and paid well before Griswold sold to Quality. In every one of the seven instances, then, it was Griswold and not Quality that paid the claims in full.

There is nothing mysterious about the doctrine of waiver. In Illinois as elsewhere (*Whalen v. K–Mart Corp.*, 166 Ill.App.3d 339, 343, 116 Ill.Dec. 776, 779, 519 N.E.2d 991, 994 (1st Dist.1988) (citations omitted)):

> Waiver is either an express or implied voluntary and intentional relinquishment of a known and existing right.... The determination as to what facts are sufficient to constitute waiver is a question of law.... An analysis of whether there was in fact a waiver of contractual provisions focuses on the intent of the non-breaching party. If he has intentionally relinquished a known right, either expressly or by conduct inconsistent with an intent to enforce that right, he has waived it and may not thereafter seek judicial enforcement.[15]

freely-entered-into contracts binding on business people. And the same result flows from an economic approach to contract law: Unlimited liability on a warehouseman's part would force higher rates to reflect the increased risk. Having benefited from the lower rates, Taylor cannot reasonably seek to shift the contractually-allocated risk *after* the potential risk of loss has proved a reality.

---

**12.** *Strom, id.* at 703, 26 Ill.Dec. at 489, 388 N.E.2d at 113 (speaking of a time limitation clause under Section 7–204(3)) said that one storing goods with a warehouseman is charged with knowledge of the industry that such limitation clauses are common in warehouse receipts. Here too the clause involved was a standard contract term for merchandise warehousemen, approved by the American Warehousemen's Association in 1964 (Quality Mem. Ex. I). By parity of reasoning with *Strom,* Taylor might be charged with knowledge of that term even if it had not been—as it was—an express part of a fully negotiated contract.

**13.** In philosophical terms, nothing in this situation involves any higher social value than the sanctity of contract. Taylor would doubtless resent being labeled an anarchist, but that is not an unfair characterization of a party that, having made a deal, searches for every untenable way to escape from the rule of law that makes

**14.** Quality's Reply Memorandum has no page numbers, a phenomenon this Court has encountered with distressing frequency in lawyers' submissions in recent months. Despite its wondering just why anyone would choose to do that, this Court has once again been forced to supply the numbers and to indicate them with brackets.

**15.** [Footnote by this Court] Accord, *Strom,* 69 Ill.App.3d at 703, 26 Ill.Dec. at 489, 388 N.E.2d at 113.

Plainly Quality (as perhaps contrasted with Griswold) has done nothing even remotely approaching a waiver of its right to enforce the contract Taylor made *with Quality*. Instead Taylor somehow seeks to impute Griswold's alleged waiver to Quality (Taylor Mem. 12 n. 8):

> Nor can Quality now conveniently disassociate itself from G & B and argue that this waiver was G & B's alone and that the slate was wiped clean on August 1986. As fully set forth ... below, having labored so hard and successfully to convince Taylor that Quality and G & B were the same, Quality cannot now disinherit the course of conduct on which Taylor had come to rely.

Taylor cannot and does not cite any authority for its novel proposition—one that obviously cannot withstand even brief scrutiny. Though it scarcely merits serious discussion, at least two fatal defects are immediately apparent.

For one thing, no purchaser of a business automatically becomes saddled with the seller's entire former course of dealings (as contrasted, for example, with specifically assumed contract obligations).[16] It would certainly chill commercial transactions if a purchaser were required to research not only all contracts executed by the seller and assumed by the buyer, but also every undocumented instance of conduct by the seller that might potentially give rise to an asserted waiver. Due diligence would certainly take on a wholly new (and unreasonable) meaning.

At least as damaging to Taylor's argument is the fact that it negotiated and entered into a *new* contract *with Quality*

after Griswold had sold its business. Waiver, after all, is a doctrine under which written agreements will not be enforced in accordance with their terms because one of the parties has engaged in conduct inconsistent with those terms. It is the height of absurdity for Taylor to suggest that newly-entered-into contract terms have been "waived" by *pre*-negotiation, *pre*-contract conduct by a party other than the one entering into the new contract. And that of course is over and above any question as to whether that prior conduct on Griswold's part was known to Taylor or Quality or both.[17]

In sum, no facts even hint that Quality ever voluntarily and intentionally waived its right to enforce the liability limitation. Nothing justifies imputing Griswold's actions to Quality.

### *Estoppel*

■ *Strom,* 69 Ill.App.3d at 703, 26 Ill. Dec. at 489, 388 N.E.2d at 113 (citation omitted) sets out the applicable principles for evaluating a claimed estoppel:

> Estoppel applies if: (1) defendant has made some misrepresentation or concealment of a material fact; (2) defendant had knowledge, either actual or implied, that the representations were untrue at the time they were made; (3) plaintiff was unaware of the untruth of the representations both at the time made and the time they were acted upon; (4) defendant either intended or expected his representations or conduct to be acted upon; (5) plaintiff did in fact rely upon or act upon the representations or conduct; and (6) plaintiff has acted on the basis of the representations or conduct such that he

---

16. Of course the classic exception to the principle stated in the text is in the corporate merger or consolidation situation, where the surviving corporation is burdened with all the liabilities of the disappearing corporation or corporations as a matter of law. But that is not so much a real exception as it is a wholly different principle inherent in the concept of corporate combinations. In fact the only real exception is the one some courts have created in certain product liability situations—not even arguably relevant to the Griswold–Quality purchase of assets and the kind of position advanced here by Taylor.

17. In some respects Taylor could be worse off (if possible) in proffering its untenable argument if such knowledge were shown to have existed when the Taylor–Quality negotiation and agreement took place. After all, entry into an agreement at odds with *known* prior conduct is at least a strong signal (if not indeed conclusive evidence) that the inconsistent agreement has superseded that prior conduct.

would be prejudiced if defendant is not estopped.[18]

Taylor says Quality made three misrepresentations on which Taylor relied to its detriment:

1. Quality concealed the extent of the damage to Taylor's products.

2. Quality concealed the true nature of its clean-up efforts after the flood.

3. Quality misrepresented its identity.

Two of those three claimed misrepresentations have no relevance at all to the only current issue—whether Quality is estopped from enforcing the contractual limitation on liability. On that score the questions whether Quality may have concealed the extent of the damage and the true nature of its clean-up are wholly beside the mark. Unless Taylor can show some linkage between those post-contract post-loss matters and Taylor's conduct in reliance on them, so that the extent of Taylor's recovery is somehow enlarged, they will not bear on the case. And surely they do not bear on the current motion—those questions remain for the future course of this litigation.

By contrast, Quality's alleged misrepresentation of its identity may in fact be relevant now. If Quality had misrepresented itself and Taylor had then executed the contract in the mistaken belief it was still dealing with Griswold (a company in which Taylor may have had faith based on its prior dealings), an estoppel might arise. But that is wholly hypothetical because the basic premise is unfounded: *Quality* did not misrepresent itself.

Taylor relies exclusively on an August 12, 1986 letter from Corbett to Deckert to establish the complained-of misrepresentation. In part that letter said (Taylor Mem. Ex. B):

We are pleased to announce that Griswold & Bateman Warehouse Company will be affiliating its Chicago operations with Quality Distribution Services Inc. as of 9/1/86. By so doing, we will be in-creasing the depth of our management staff, adding new services, and consolidating operations in one general location.

\* \* \* \* \* \*

As you can see, the service we offer you will be outstanding with this kind of expertize [sic] hand in hand with Griswold & Bateman's 120 years of experience. The joining of our two companies will be called: Quality Distribution/Griswold & Bateman of Illinois.

That letter might fairly be read to suggest a combination between Griswold and Quality rather than an outright sale. And that is not in fact the case. Quality and Griswold are entirely separate corporations (Corbett Dep. 72). Corbett admitted she has no "knowledge of Quality and its business setup" (*id.*). She has never owned stock in Quality, nor has Pagone owned stock in Griswold (Pagone Dep. 179–80).

What is relevant on the estoppel issue, of course, is not necessarily those actual facts but rather how Quality might have falsely portrayed them. As to that, however, on the evidence before this Court Corbett's letter simply cannot be imputed to Quality. Again there is a total absence of any facts demonstrating Quality either knew or approved of her letter. Because there is no showing whatever of any misrepresentations *by Quality*, this last weak reed on which Taylor's estoppel defense seeks to lean is rejected as well.

### Conversion to Quality's Own Use

Under the second sentence of Section 7–204(2), Quality's otherwise valid liability limitation may not be enforced if and to the extent Quality converted Taylor's goods to its own use. Taylor Mem. 21 says Quality converted Taylor's goods in three ways:

1. Quality bulldozed Taylor's products out the front door into trailers, to make room for the cleanup of Yamaka china (Taylor Mem. Ex. A ¶ 26).

---

**18.** [Footnote by this Court] See also *Citation Cycle Co. v. Yorke,* 693 F.2d 691, 695 (7th Cir. 1982) and this Court's opinion applying *Strom* in *Refrigeration Sales Co. v. Mitchell–Jackson,* *Inc.,* 575 F.Supp. 971, 976 (N.D.Ill.), *motion for reconsideration denied,* 605 F.Supp. 6 (N.D.Ill. 1983), *aff'd,* 770 F.2d 98 (7th Cir.1985).

2. Quality negligently left Taylor's products in disarray after the flood, subjecting those products to further damage and pilferage.

3. Quality neglected Taylor's products by leaving them exposed to water in their shipping containers for weeks after the flood.

■ This Court's *Refrigeration Sales* opinion (see n. 18) has previously dealt in some detail with the concept of conversion under Section 7–204(2). Because that statute requires a "conversion to one's own use," Taylor's showing must encompass not only a garden-variety conversion but also proof that Quality acquired the goods for its own benefit (575 F.Supp. at 977). *Refrigeration Sales, id.* at 977 n. 10 also quotes *Illinois Education Association v. Illinois Federation of Teachers*, 107 Ill. App.3d 686, 689, 63 Ill.Dec. 343, 345, 437 N.E.2d 1265, 1267 (4th Dist.1982) to describe conversion under Illinois law:

> In order to make out a case for conversion, the plaintiff must establish each of the following four elements: (1) unauthorized and wrongful assumption of control, dominion, or ownership over the personal property of another; (2) the plaintiff's right to the property; (3) his absolute and unconditional right to immediate possession of the property; and (4) a demand for possession.[19]

If Quality in fact bulldozed Taylor's products out the front door, that would unquestionably constitute a conversion. *Prosser and Keeton on Torts* § 15, at 100 (5th ed. 1984) (footnote omitted) states the matter simply:

> If the defendant, intending to do so, completely destroys the plaintiff's chattel, as by burning a paper, there is obviously a complete interference with the plaintiff's rights, and an obvious conversion.... 

To be sure, Quality did not appropriate the goods for its own use in the most conventional sense. But it is at least arguable that the conversion of Taylor's goods fit that description within the sense employed in the last sentence of Section 7–204(2), because Quality carried out bulldozing so that it could clear Yamaka's products.

Quality does not respond to this conversion argument. Instead it contends the issue is irrelevant to the current motion. Because of Quality's silence, the only facts before this Court on the conversion issue are Deckert's assertions (Taylor Mem. Ex. A ¶ 26). And the parties have not really addressed the legal question of statutory meaning in any meaningful way either. At this stage it is enough to say that if and to the extent such a conversion "to [Quality's] own use" is proved, the contractual liability limitation will not be enforceable as to any goods Quality bulldozed.

However, none of Taylor's remaining conversion claims has merit. *Refrigeration Sales*, 575 F.Supp. at 977 n. 10 explains why Quality's other conduct as to the damaged goods did not constitute an unauthorized assumption of "control, dominion, or ownership." Indeed, as *Prosser and Keeton* § 15, at 101 (footnote omitted) states:

> [M]ere damage, falling short of destruction or material alteration, usually may be compensated without the forced purchase which is the distinguishing feature of the remedy, and so is not treated as conversion.

Nor do any allegations of pilferage satisfy Section 7–204(2), because any goods in that category were not converted to Quality's *own* use. If any Taylor products were stolen, Quality obviously did not benefit by the theft.

In summary, the liability limitation may be unenforceable as to any goods Quality bulldozed in an attempt to clear the warehouse. But that is the only assertion of conversion that can arguably qualify under Section 7–204(2), and that remains to be seen in both factual and legal terms. In all other respects Taylor's claim is rejected.

**19.** [Footnote by this Court] Accord, *Andrews v. Mid–America Bank & Trust Co. of Fairview Heights*, 152 Ill.App.3d 139, 142, 105 Ill.Dec. 114, 116, 503 N.E.2d 1120, 1122 (5th Dist.1987); *A.T. Kearney, Inc. v. Inca Int'l, Inc.*, 132 Ill.App.3d 655, 664, 87 Ill.Dec. 798, 806, 477 N.E.2d 1326, 1334 (1st Dist.1985).

*Conclusion*

Taylor knowingly agreed to the liability limitation in both the Rate Quotation and in all warehouse receipts. Quality has not waived its right to enforce that limitation, nor is it estopped from doing so.

That being so, the limitation is fully enforceable except as to any goods Quality may be shown to have converted "to its own use." In this case that means the limitation may perhaps be unenforceable, but if so that would be true only as to goods Quality bulldozed in an effort to clear its warehouse. In all other respects Taylor's damages are limited to a maximum of $17.875 per case.[20]

---

20. Taylor Mem. Ex. A ¶¶ 29–30 says Quality also stored "specialty pack" components for Taylor, for which no storage charges were ever billed or paid. Then Taylor Mem. 9 n. 6 asserts:

Additional damages are claimed arising from the loss of specialty pack components but, since these were not stored under the terms of any liability limitation, they are not included within defendants' motion and, therefore, will not be further discussed here.

Quality's Reply Memorandum simply does not speak to the issue. Nothing in this opinion should be viewed as an expression of this Court's views either way on the matter.