**James P. KERRIGAN, Plaintiff–
Appellant,**

**v.**

**AMERICAN ORTHODONTICS
CORPORATION, Defendant–
Appellee.**

**No. 91–1962.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 27, 1992.

Decided April 7, 1992.

44

Donald J. Driscoll, Gary A. Ahrens, Thomas G. Herz, argued, Michael, Best & Friedrich, Milwaukee, Wis., for James P. Kerrigan, Dr.

Michael B. Apfeld, argued, Jane C. Schlicht, Godfrey & Kahn, Milwaukee, Wis., for American Orthodontics Corp.

Before CUMMINGS and EASTERBROOK, Circuit Judges, and SHADUR, District Judge.*

EASTERBROOK, Circuit Judge.

David A. Hoffman purchased some shares in American Orthodontics Corporation. In 1971 he sold 50 of these shares to James P. Kerrigan, a fellow dentist. Hoffman retained the certificates as Kerrigan's (undisclosed) agent and remained the registered owner on the books of Orthodontics. The record does not reveal why Hoffman did not transfer the shares to Kerrigan. Counsel suggested at oral argument that such an arrangement was common, designed to make it appear that Orthodontics had fewer investors than the 15 that would have triggered reporting and perhaps registration requirements under Wisconsin law. Kerrigan came to regret letting Hoffman keep the shares, for Hoffman redeemed the stock in 1986, receiving $112,-500. Kerrigan has a worthless judgment

* Honorable Milton I. Shadur, of the Northern District of Illinois, sitting by designation.

against Hoffman, who filed a petition in bankruptcy. Kerrigan sought, but did not obtain, a judgment against the solvent Orthodontics.

Since being filed, this case under the diversity jurisdiction has become progressively simpler. Originally it included a claim by Patricia Kerrigan, James's spouse, to the proceeds of a second 50 shares; a jury determined that Patricia had not paid for, and thus did not own, these shares. She has dropped out of the case. James Kerrigan prevailed against Hoffman, but this unsatisfied judgment will not detain us. A jury concluded that Orthodontics acted with due care in paying Hoffman, and that at all events Kerrigan could not recover in tort because he was negligent in allowing Hoffman to hang onto the certificates. Kerrigan has not appealed from the judgment entered on the jury's verdict. All that remain for decision are theories the district judge deleted before trial: that Orthodontics converted his investment by paying Hoffman, and that the firm is liable because it did not undertake the reasonable pre-transfer inquiry that § 8–403 of the Uniform Commercial Code (adopted in Wisconsin as Wis.Stat. § 408.403) prescribes when an issuer is aware of an adverse claim to the stock. Orthodontics was aware of such a claim. In 1985 Kerrigan sent Hoffman a letter revoking his agency and demanding that he transfer the shares to Kerrigan's name; he sent a copy of this letter to Orthodontics. Kerrigan also invoked § 5 of the Uniform Act for Simplification of Fiduciary Security Transfers, adopted in Wisconsin as Wis.Stat. § 112.-06(5). Neither § 8–403 nor § 5 purports to create a right of action to collect damages, however, so all turns on Kerrigan's assertion that redemption of securities on demand of a faithless agent is conversion by the issuer.

■ Orthodontics contends that the jury's verdict necessarily defeats Kerrigan's remaining claims. This would be so only if contributory negligence were a defense to conversion. Orthodontics has not drawn our attention to a decision so holding, and this omission is not an oversight.

Many cases hold that contributory negligence is not a defense. E.g., *Row v. Home Savings Bank*, 306 Mass. 522, 29 N.E.2d 552 (1940); *Lund's, Inc. v. Chemical Bank*, 870 F.2d 840, 850 (2d Cir.1989) (discussing how the UCC changed the common law). Conversion grew out of trover, and the paradigm was a finder keeping lost goods. *Prosser & Keeton on the Law of Torts* § 15 (5th ed. 1984). Negligence could not be a defense without abolishing the tort, for in most cases the owner's loss of the property could be called negligent. Conversion is an intentional tort, *id.* at 92–93; *Refrigeration Sales Co. v. Mitchell-Jackson, Inc.*, 770 F.2d 98, 101 (7th Cir. 1985), and as a rule the victim's contributory negligence is no defense to intentional torts, *Restatement (2d) of Torts* § 481 (1965). Perhaps this is why the Uniform Commercial Code contains a special rule absolving agents and bailees of liability for conversion when they act in good faith (that is, with honesty in fact, UCC § 1–201(19)) and observe "reasonable commercial standards", UCC § 8–318. See also *Restatement* § 244; UCC § 3–406.

■ Is wrongful redemption of stock conversion? Surprisingly, Kerrigan does not cite a case in any jurisdiction holding that it is. We found only one: *Shidler v. All American Life & Financial Corp.*, 775 F.2d 917, 925–26 (8th Cir.1985), says that Iowa would treat wrongful redemption as conversion. Here lies something of a conceptual problem. Conversion is unprivileged interference with the owner's possession and enjoyment of a chattel. A corporation accordingly may convert stock by refusing to register a transfer to the owner; refusal to record the change prevents the buyer from having the benefits of ownership. *Restatement* § 242 comment e; *Prosser & Keeton* at 91 & n. 30 (collecting cases). Redemption and cancellation of the stock is at least potentially different. Stock represents a claim against corporate assets. By redeeming stock, a corporation does not acquire an ownership interest in itself. Rather, the remaining investors acquire larger proportionate stakes in a smaller pie. The transaction is a wash for both the other investors and the firm (as an

aggregate of all investors). Granted, the buyer from a thief converts the asset even though the purchase leaves the buyer no better off. *Restatement* § 229 comment e. But in such cases the asset continues to exist. Stock is valuable not for the paper on which shares are printed (these days much stock is not represented by certificates and so has no physical existence) but for the interest in the issuer it represents. When this interest vanishes, the person surrendering the stock looks most like the converter.

■ All of this is no more than an interesting detour, however. Hoffman was the registered owner of the Orthodontics stock. The Uniform Commercial Code overrides the common law and authorizes corporations to treat the registered owners of stock as the rightful owners. Section 8–207(1) provides:

> Prior to due presentment for registration of transfer of a certificated security in registered form, the issuer or indenture trustee may treat the registered owner as the person exclusively entitled to vote, to receive notifications, and otherwise to exercise all the rights and powers of an owner.

One of the "rights and powers of an owner" of Orthodontics' stock was to surrender the shares for redemption. This Hoffman did, and § 8–207(1) allowed Orthodontics to honor that request without fear of liability. The real owner may terminate the corporation's privilege by making "due presentment for registration of transfer", but Kerrigan never asked Orthodontics to put the stock in his name. After sending Orthodontics a copy of the letter revoking Hoffman's agency, Kerrigan never asked Orthodontics to do *anything*. That will not serve: "Mere notice is not enough under this section to impose upon the issuer the duty of dealing with" the person claiming an interest adverse to the registered owner (§ 8–207 official comment 2).

Agents hold significant quantities of securities. Brokers hold for customers; street-name corporations hold stock for the convenience (or to disguise the identity) of the beneficial owners; trustees hold for their beneficiaries; the list is extensive. Not all of these agents are trustworthy, and even when they are there will be a gap between changes in an agent's authority and the communication of those changes to the transfer agent. Issuers daily pay dividends, count votes, redeem stock, and so on. If every dispute about an agent's authority could be litigated against the issuer, the potential liabilities would be considerable—and the issuer is not well placed to know who the true owner is. Persons may send the issuer letters (as Kerrigan did) *claiming* to be the owners, but how are the issuers to know? Section 8–207 places on the owners, rather than the issuers, the burden of protecting their claims. Faithless agents such as Hoffman, rather than issuers that are bystanders to the dispute, are answerable for their wrongs. Beneficial owners can at least choose their agents, as Kerrigan chose (and trusted) Hoffman; issuers cannot turn away agents for fear that they will later play false with the owners.

■ Because issuers may treat registered owners as the real owners, it is important that persons seeking to *become* registered owners demonstrate the bona fides of their claims. This is where § 8–403 comes in. When "a certificated security in registered form is presented to the issuer with a request to register transfer", § 8–401(1), and the formal requirements of that section have been met, the issuer has a duty to change the registered ownership and is liable for refusing to do so, § 8–401(2). But the issuer need not (indeed may not) change the registration until it has discharged its duty regarding adverse claims under § 8–403. See § 8–401(1)(c). Section 8–403(1) in turn provides that an "issuer to whom a certificated security is presented for registration shall inquire into adverse claims if: (a) a written notification of an adverse claim is received at a time and in a manner affording the issuer a reasonable opportunity to act on it prior to the issuance of a new, reissued, or re-registered certificated security". (Wisconsin enacted this language with different punctuation; we quote the official text.) It

is this section that Kerrigan believes Orthodontics violated. Yet it should be apparent that § 8–403 has nothing to do with the subject. It is designed to prevent a "transfer"—the "issuance of a new, reissued, or re-registered certificated security" in the name of a new owner—that will secure for an unauthorized person (such as a thief) the privileges of ownership. Once the shares are in new hands, § 8–207 gives the registered owner dominion. Sections 8–401(1) and 8–403(1) thwart improper changes. Official comment 1 to § 8–403 remarks that "[p]aragraph (a) of subsection (1) is the ordinary 'stop transfer' notice commonly resorted to by the owner of a lost or stolen certificated security or in a situation where breach of trust, disregard of a valid restriction on transfer, or other improper action is feared to have occurred or to be about to occur."

Orthodontics did not "transfer" any stock to new hands. Hoffman was the registered owner for the entire period. As registered owner, he exercised one of the rights of ownership. Section 8–207 protects Orthodontics from liability for honoring the registered owner's instructions. Nothing in the Uniform Act for Simplification of Fiduciary Security Transfers overrides § 8–207. Section 5 of the Uniform Act, like § 8–403, deals with a "claim of beneficial interest adverse to the transfer" of stock and specifies: "Nothing in this act relieves the corporation or transfer agent of any liability for making or refusing to make the transfer after it is so put on notice, unless it proceeds in the manner authorized in subsection (b)." (Again Wisconsin's version differs from the model in technical detail, which we ignore.) Redemption by the registered owner is not a "transfer" to a new registered owner. More, nothing in § 5 *creates* liability for wrongful transfer. It is accordingly unhelpful to Kerrigan.

Kerrigan left the stock with Hoffman for 15 years. Kerrigan never asked Orthodontics to transfer ownership of the shares to him. Orthodontics accordingly treated Hoffman as the owner; § 8–207 allows an issuer to do this. Kerrigan has Hoffman (and himself) to blame for the events, and

the UCC does not permit a careless investor to shift to the issuer the liability for the misconduct of the investor's chosen agent.

AFFIRMED.

SHADUR, District Judge, concurring.

Both the holding and the analysis of the ultimate issues contained in the court's opinion are literally and figuratively right on the money. Indeed, the opinion unsnarls many of the needless complexities that have been presented by the litigants, instead focusing on and resolving the core issues posed in this case rather than exploring several of the byways invited by the parties' advocacy.

Only a few words should be said about what the opinion accurately characterizes as "an interesting detour." Because the issue that is posed by the opinion's dictum on that score—the potential or lack of potential for any corporate liability for conversion of the corporation's own stock by an improper redemption—may recur in the future, it seems appropriate to reflect a different perspective on that subject. Hence this brief concurrence.

Conversion essentially depends not on benefit to the converter but on detriment to the owner. To be sure, when a thief (for example) converts an owner's property, he or she does so to make it his or her own—indeed, there is a special label of "conversion to his own use" that has been established by UCC § 7–204(2), adding an ingredient to the common law tort of conversion for limited purposes. But the exercise of dominion over the rightful owner's property—the essence of conversion—frequently causes harm to the owner *without* any corresponding benefit to the converter. That kind of situation is often encountered in the bailment relationship—see the treatment of "conversion" and "conversion to one's own use" in my opinions in *W.A. Taylor & Co. v. Griswold & Bateman Warehouse Co.*, 719 F.Supp. 697, 705–06 (N.D.Ill.1989) (applying Illinois law and the UCC); *Refrigeration Sales Co. v. Mitchell-Jackson, Inc.*, 575 F.Supp. 971, 976–77 (N.D.Ill.1983) (same), *aff'd*, 770 F.2d 98 (7th

Cir.1985); *Inland Metals Refining Co. v. Ceres Marine Terminals, Inc.*, 557 F.Supp. 344, 347–49 (N.D.Ill.1983) (applying Indiana law and the UCC).

Just so, the fact that the redemption of stock involves a zero-sum game as to the redeeming corporation does not at all foreclose the conclusion that a wrongful redemption by that corporation may be a conversion. When the spotlight of legal analysis is turned instead on the impact upon the rightful owner (that is, the *assumed* rightful owner for purposes of this discussion), there has indeed been the exercise of dominion by the corporation over the owner's property (comprising the bundle of rights to dividends and the proceeds of redemption or liquidation as well as the intangible right of voting the stock)—and that exercise of dominion has imposed the type of harm on the owner that the law finds compensable.

· Hence there is no conceptual roadblock to a corporation's being mulcted in damages for the conversion of its own stock via redemption to the detriment of the rightful owner. Recognition of such a claim by the Eighth Circuit in *Shidler v. All American Life & Financial Corp.*, 775 F.2d 917, 925–26 (8th Cir.1985), citing and quoting as it did 4 William Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 1969, at 697 (Charles Keating rev.1985), seems entirely sound.

What dooms Dr. Kerrigan's claim against American Orthodontics here is not, then, the wrongful-exercise-of-dominion component of the conversion claim, but rather the fact that the plaintiff in a conversion action must be the rightful owner of the asset. If the issue were one of Kerrigan's rights as against Dr. Hoffman, Kerrigan would have had no problem in adding a claim in conversion to the other grounds of Hoffman's liability: As between them, Kerrigan owned the 50 shares and Hoffman was his nominee.

As to American Orthodontics, however, Kerrigan's mere letter *notification* of his claim of ownership without a *demand* for transfer into his own name is not enough. As the court's opinion accurately states,

UCC § 8–207(1) tells us that Kerrigan was *not* the owner of the shares as between himself and American Orthodontics, and that is fatal to his conversion claim. Accordingly I join the court's determination that Kerrigan cannot gain access to American Orthodontics' treasury, the only remaining deep (or if not deep, at least solvent) pocket that is potentially available to recoup the loss caused by Hoffman's faithlessness to his duties as nominee.