Thorn C. HUFFMAN, and John A. Eriksson, Plaintiffs-
Appellants,†

v.

ALTEC INTERNATIONAL, INC., Defendant-Third Party
Plaintiff-Respondent,

v.

EQUIVEST ASSOCIATES, an Oklahoma partnership con-
sisting of Joseph A. Frates, Robert E. Merrick, P.
Peter Prudden III, J. Anthony Frates, and Stephen I.
Frates, Third Party Defendants.

Court of Appeals

*No. 93–0782. Oral argument December 17, 1993.—Decided
January 11, 1996.*

(Also reported in 546 N.W.2d 162.)

†Petition to review denied.

78

For the plaintiffs-appellants the cause was submitted on the briefs of *Murray E. Abowitz* and *Norman*

*Lemonik* of *Abowitz, Welch & Rhodes, P.C.* of Oklahoma City, Oklahoma, and *Marvin H. Davis* of *Davis, Birnbaum, Marcou, Devanie & Colgan* of La Crosse. Oral argument by *Norman Lemonik*.

For the defendant-third party plaintiff-respondent the cause was submitted on the briefs of *Brent P. Smith* of *Johns & Flaherty, S.C.* of La Crosse. Oral argument by *Brent P. Smith*.

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

SUNDBY, J. Plaintiffs Thorn C. Huffman and John A. Eriksson brought this action against Altec International, Inc., claiming rights as shareholders. They contend that Altec should have made cash distributions to them as shareholders and not to Equivest Associates, through whom they obtained their Altec shares. They also claim that Altec breached its fiduciary duty to them as shareholders when it made a corporate loan to other Altec shareholders to purchase their stock from Lloyds Bank, to whom Equivest pledged their stock to secure a loan. We conclude that § 408.207(1), STATS. [Uniform Commercial Code § 8-207(1)],[1] permitted Altec to treat Equivest as the owner of plaintiffs' stock because Equivest was the registered owner according to Altec's corporate books.[2]

---

[1] Section 408.207(1), STATS. [U.C.C. § 8-207(1)], provides:

> Prior to due presentment for registration of transfer of a certificated security in registered form, the issuer or indenture trustee may treat the registered owner as the person exclusively entitled to vote, to receive notifications, and otherwise to exercise all the rights and powers of an owner.

The Wisconsin legislature adopted the Uniform Commercial Code in Laws of 1963, ch. 158.

[2] "[D]ue presentment for registration" of a certificated security typically requires that the security be presented to the

Because plaintiffs do not state a claim against Altec, we affirm the order granting Altec's motion for summary judgment dismissing plaintiffs' complaint.

## BACKGROUND

Altec incorporated in Wisconsin as Albraze International, Inc.[3] Albraze issued 10,000 shares of common stock to each of its three shareholders: Arthur S. Holmes, Asset Management Associates (AMA), and Equivest Associates, an Oklahoma partnership. In September 1987, the shareholders pledged Altec's stock to Lloyds Bank to secure loans to Charles S. Holmes, the principal owner of AMA, and to Equivest.

In March 1988, Altec elected to be taxed as a Subchapter "S" corporation, which required that its stock be held by individuals. Equivest completed an IRS form, "Election by a Small Business Corporation," which showed that Equivest had transferred 350 shares of Altec stock to each plaintiff. Altec submitted Amended Shareholder Agreements to Holmes, AMA, and Equivest for them to sign and return to Altec. It informed the shareholders that the old stock certificates would have to be returned with the Amended Shareholder Agreements before new stock certificates would be issued. Neither Huffman nor Eriksson had certificates to return because their stock had been pledged by Equivest to secure its loan from Lloyds, and the new certificates were held by Altec's president,

"transfer office." *See* EGON GUTTMAN, MODERN SECURITIES TRANSFERS ¶ 11.01 (3d ed. 1987). "Transfer office" includes both the issuer of the security (Altec) and a "professional" transfer agent. *Id*. at ¶ 11.01 n.13.

[3] Albraze changed its name to Altec International, Inc. on November 20, 1986.

Arthur Holmes, pending satisfaction of Equivest's obligation to Lloyds.

Altec concedes that from March 1988 when it elected Subchapter "S" status, it knew that Huffman and Eriksson were the beneficial owners of 700 shares of Altec stock.

Between January 27 and March 14, 1990, the Altec board of directors took the following action:

> An offer was approved for the Company to purchase the 10,000 shares of common stock currently owned by the successors of Equivest Associates at a price of $250 per share.
>
> *The offer is contingent upon Lloyds bank approval to release these shares* which it holds under a Pledge Agreement and upon approval of each individual shareholder as follows:
>
> . . . .
>
> John A. Eriksson—350—$87,500
>
> . . . .
>
> Thorn C. Huffman—350—$87,500

(Emphasis added.)

Before Lloyds could release these shares, Equivest defaulted on its loan and Lloyds sold the pledged stock, including plaintiffs' shares, at public auction. The day before the sale, a majority of Altec's board of directors, Arthur S. Holmes and Charles S. Holmes, held a special telephone meeting of the board at which Altec advanced $3,100,000 to Arthur Holmes, Charles Holmes and Leonard Conway to purchase the Altec stock. Thereafter, the owners of Altec's stock were Arthur S. Holmes—15,000 shares, Charles S. Holmes—10,500 shares, and Leonard Conway—4,500 shares. Plaintiffs were not compensated for the loss of

their beneficial ownership of their shares of Altec stock. They seek that compensation in this action.

Plaintiffs allege that Altec breached its fiduciary duty to them when it distributed cash dividends to Equivest rather than to them. They also claim that Altec wasted corporate assets when it loaned corporate funds to shareholders to purchase plaintiffs' stock from Lloyds Bank.

## UNIFORM COMMERCIAL CODE

Altec argues that § 408.207(1), Stats. [U.C.C. § 8-207(1)], permitted it to treat Equivest, the registered owner of plaintiffs' stock, as the "person" entitled to pledge the stock and to receive cash distributions. Section 408.207(1) provides:

> Prior to due presentment for registration of transfer of a certificated security in registered form, the issuer or indenture trustee may treat the registered owner as the person exclusively entitled to vote, to receive notifications, *and otherwise to exercise all the rights and powers of an owner.*

(Emphasis added.)

Altec contends that the right to receive cash distributions and to pledge stock are "rights and powers" of the registered owner of corporate securities. Its contention is supported by commentators on the Uniform Commercial Code and Official Comments. Commentators on the Code have written that § 8-207(1) means what it says: "Under the Code, the issuer . . . may continue so to recognize the registered owner, even after he has transferred his security, so long as the new owner has not made a due presentment for registration of transfer." 3 R.A. ANDERSON, UNIFORM COMMERCIAL CODE 711 (2d ed. 1971).

The Permanent Editorial Board (PEB) of the Uniform Commercial Code which "watchdogs"[4] the commercial code asks:

> Under what circumstances will a distribution of money or other property to the registered owner of a certificated security provide the issuer with a defense against a claim to that distribution asserted by a pledgee who was a bona fide purchaser and in

[4] The Uniform Commercial Code's Reporting Service gives the following instructions regarding the PEB:

1. The Permanent Editorial Board (PEB), in accordance with the standards and procedures set out in this resolution of March 14, 1987, and the authority given in the agreement between the American Law Institute and the National Conference of Commissioners on Uniform State Laws dated July 31, 1986, will issue supplemental commentary on the Uniform Commercial Code (UCC) from time to time.

a. The supplementary commentary of the PEB generally will be known as *PEB Commentary*, to distinguish it from the Official Comments to the UCC, and will be preserved separately from the Official Comments.

b. The underlying purposes and policies of the *PEB Commentary* are those specified in UCC § 1-102(2). A *PEB Commentary* should come within one or more of the following specific purposes, which should be made apparent at the inception of the Commentary: (1) to resolve an ambiguity in the UCC by restating more clearly what the PEB considers to be the legal rule; (2) to state a preferred resolution of an issue on which judicial opinion or scholarly writing diverges; (3) to elaborate on the application of the UCC where the statute and/or the Official Comment leaves doubt as to the inclusion or exclusion of, or application to, particular circumstances or transactions; (4) consistent with UCC § 1-102(2)(b), to apply the principles of the UCC to new or changed circumstances; (5) to clarify or elaborate upon the operation of the UCC as it relates to other statutes . . . and general principles of law and equity . . .; or (6) to otherwise improve the operation of the UCC.

U.C.C. Rep. Serv., PEB Commentaries, vii (Callaghan).

possession of that security at the time of such distribution?

U.C.C. Rep. Serv., PEB Commentary No. 4, 15 (Callaghan).

The PEB answers that the objective of § 8-207(1) is to protect the issuer by express authorization to treat the original registered owner of a security, during the "gap" between the time of delivery and presentment, as the person entitled to the rights of ownership, including the right to receive distributions and dividends. *Id.*

The PEB notes that where there is an outright sale of a security, § 8-207(1) does not create a serious problem. The purchaser will normally present the security for registration of transfer as promptly as possible. *Id.* at 16. However, where securities are pledged, as is our case, the pledgee does not normally present the securities to the issuer for registration of the transfer. Also, possession of the security by the pledgee effectively prevents the pledgor from transferring it to another purchaser and places the pledgee in the position where registration of transfer can be obtained if the pledgor defaults. *Id.* When the loan secured by the security is repaid, as is usually the case, the securities already registered in the pledgor's name are returned to the pledgor. This procedure avoids two unnecessary registrations of transfer: pledgor to pledgee and, then, pledgee back to pledgor. *Id.* Furthermore, while the security remains pledged, the pledgor continues to receive reports, proxy materials, and periodic dividend or interest payments directly from the issuer and without inconvenience to the pledgee. The PEB concludes: "This is precisely the result normally intended by the parties to the pledge transaction." *Id.* The PEB further concludes that, even in the pledge context, the rule of U.C.C. § 8-207(1), "notwithstanding the existence of

dual interests in the security, generally produces results that are both efficient and fair." *Id.*

The "dual interests" to which the PEB refers are the "interest" of the registered owner of the security and the "interest" of the beneficial owner who has purchased the security or to whom the security has been transferred. The "interest" of the registered owner is a defeasible interest which nonetheless the issuer of the security may assert as a defense against claims by the beneficial owner.

Professor Kenneth B. Davis, Jr. terms record ownership a "mystique." In his article *Pledged Stock and the Mystique of Record Ownership*, 1992 WIS. L. REV. 997, he concludes:

> In summary, in an action by the holder to recover a dividend or other distribution on a security, the issuer establishes a valid defense within the meaning of section 8-105(3)(c) [§ 408.105(3)(c), STATS.[5]] by showing that it has paid the distribution to the registered owner under section 8-207(1). The burden then shifts to the holder under sections 8-105(3)(e) [§ 408.105(3)(e)] and 8-202(4) [§ 408.202(4), STATS.[6]] to show that he or she is a purchaser for value without notice.

---

[5] Section 408.105(3)(c), STATS., provides:

If signatures on a certificated security are admitted or established[,] production of the security entitles a holder to recover on it unless the defendant establishes a defense or a defect going to the validity of the security.

[6] Section 408.202(4), STATS., provides:

All other defenses of the issuer of a certificated or uncertificated security, including nondelivery and conditional delivery of a certificated security, are ineffective against a purchaser for value who has taken without notice of the particular defense.

*Id.* at 1020. But in the view of the PEB, "this burden cannot ordinarily be met because the [purchaser for value] has notice of the issuer's privilege of dealing exclusively with the registered owner under § 8-207(1)." *Id.*

In a recent decision, the Seventh Circuit Court of Appeals effectively extended the issuer's right to rely on record ownership. In *Kerrigan v. American Orthodontics Corp.*, 960 F.2d 43 (7th Cir. 1992), the court applied U.C.C. § 8-207(1) to a closely-held corporation's repurchase of its stock. *Pledged Stock* at 1023 n.112.

It is undisputed that plaintiffs obtained beneficial ownership of their Altec stock through Equivest's transfer of 2,500 shares of Altec stock to Keyvest Associates, a partnership of which plaintiffs were part owners. They claim that by that transfer, they acquired all the rights Equivest had in Altec's stock. Section 408.301(1), STATS. [U.C.C. § 8-301(1)], provides: "Upon transfer of a security to a purchaser (s. 408.313) the purchaser acquires the rights in the security which his or her transferor had or had actual authority to convey unless the purchaser's rights are limited by s. 408.302." Professor Davis observes that this provision operates to transfer the underlying rights in securities, *i.e.*, beneficial ownership, independent of what appears on the issuer's books. *Pledged Stock* at 1062 & n.272.

Section 408.302(3), STATS. [U.C.C. § 8-302(3)], provides: "A bona fide purchaser in addition to acquiring the rights of a purchaser (s. 408.301) also acquires his or her interest in the security free of any adverse claim." Thus, after Equivest transferred 350 shares of Altec's stock to each plaintiff, it had no claim to the stock, nor did Altec have a claim to that stock superior to plaintiffs'. Section 408.207(1), STATS., however, gave Altec a *defense* to plaintiffs' claims as equitable owners.

U.C.C. § 8-302(3) furthers the objective of the Uniform Stock Transfer Act and U.C.C. Article 8. *See Pledged Stock* at 1062. As Professor Davis suggests, the function of record ownership "remains in full flower for some purposes, but is of diminished importance for others." *Id.* Section 408.302(3) remains in flower to further the objective of negotiability but wilts when juxtaposed with § 408.207(1).[7]

Professor Davis also suggests that the picture that emerges from the evolving role of record ownership in both commercial and corporate law "is of a doctrine very much in transition." *Id.* at 1069. In interpreting the U.C.C. provisions as to investment securities, we are not so much persuaded by logic as we are bound by history. As Professor Davis notes, "[o]ver the course of this century . . . the convenience of allowing the issuer to rely on record ownership has dominated." *Id.* at 1070. The PEB added a comment to U.C.C. § 8-207 which strengthens our reliance on history. The following paragraph was added by the PEB immediately following the first paragraph of Official Comment 1 to § 8-207:

> The issuer may, under this section, make distributions of money or securities to the registered owners of certificated securities without requiring further proof of ownership, provided that such dis-

---

[7] We note parenthetically that this appeal does not involve who may vote pledged stock where the beneficial ownership of the stock is in an innocent purchaser for value who is not the pledgor or pledgee. Professor Davis suggests that if this question is not clearly answered in the pledge agreement, the agreement itself should be construed as an irrevocable proxy. Kenneth B. Davis, Jr., *Pledged Stock and the Mystique of Record Ownership*, 1992 WIS. L. REV. 997, 1067. Of course, as Professor Davis suggests, "the ideal solution is more explicit drafting." *Id.*

tributions are distributable to the owners of all securities of the same issue and the terms of the security do not require its surrender as a condition of payment or exchange. Any such distribution shall constitute a defense against a claim for the same distribution by a person, even if that person is in possession of the security and is a bona fide purchaser of the security.

U.C.C. Rep. Serv., PEB Commentary No. 4, 20 (Callaghan).

It is undisputed that the cash distributions made by Altec were to owners of all shares of the same issue and the terms of the securities did not require their surrender as a condition of payment.

In an effort to promote a reasonable and uniform construction of U.C.C. § 8-207(1) [§ 408.207(1), STATS.], the PEB offers the following guidelines, *see id.* at 19-20:

(1) *A distribution to the registered owner of a security is protected under § 8-207(1) only if it is distributable to the owners of all securities of the same issue.* That guideline is satisfied in this case because the distributions by Altec were made to all shareholders.

(2) *If the terms of the security require its surrender as a condition of payment or exchange, a distribution to the registered owner in payment or exchange is not protected under § 8-207(1) unless the security is surrendered.* This guideline does not apply here.

(3) *Distributions to all registered owners of a security, the terms of which do not require the surrender thereof, are protected under § 8-207(1), regardless of the regularity, amount, or nature of such distributions.* The comment intends to make clear that protection is extended to distributions of stock dividends, stock splits, spin-offs and other extraordinary distributions,

89

even though they may substantially impair the value of the outstanding securities. *Id.*

(4)  *A distribution to the registered owner that is protected under § 8-207(1) constitutes a defense against a claim to such distribution by a person in possession of the security, even if such person is a bona fide purchaser.* This guideline controls the distributions which Altec made to all shareholders. The PEB says as to this guideline: "The entire purpose of § 8-207(1) would be vitiated if a distribution protected by it could *not* be successfully asserted against a claim by a person in possession of the security, who, in most cases, will be a bona fide purchaser." *Id.* at 20 (emphasis added).

We conclude that plaintiffs' claim of estoppel cannot prevail over § 408.207(1), STATS. The elements of equitable estoppel are (1) action or inaction that (2) induces *reasonable reliance* by another (3) to his or her detriment. *Mercado v. Mitchell*, 83 Wis. 2d 17, 26-27, 264 N.W.2d 532, 537 (1978). We have previously noted the public policy reasons for enacting § 408.207(1): Namely, to protect the issuer of stock by expressly authorizing the issuer to treat the original registered owner of a security, during the "gap" between delivery and presentment, as the person entitled to all rights of ownership. In view of the purposes behind § 408.207(1), Huffman and Eriksson cannot reasonably rely on their equitable ownership rights. The registered-owner defense remains firmly ascendant.

Plaintiffs argue, however, that Altec did not deliver to them the new stock certificates Altec issued when it made its Subchapter "S" election. Altec concedes that the new stock certificates were kept by its president, Arthur Holmes. Altec argues that Holmes

was to hold the new certificates until the beneficial owners surrendered the old stock certificates and executed and returned the Amended Shareholder's Agreement. Even if plaintiffs have the better of the argument, they have not shown that they made any effort to make the "due presentment for registration" required by § 408.207(1), STATS. They knew that Altec had to replace the stock certificates held by Equivest with certificates owned by individuals. They knew that such certificates in their names had been issued by Altec but they did not attempt to obtain and register those certificates.

We next consider plaintiffs' claim that Altec breached its fiduciary duty to them when it authorized the use of corporate funds to purchase their shares of stock from Lloyds. Equivest pledged its shares of Altec's stock, including plaintiffs' stock, to secure its loan from Lloyds. Under § 408.207(1), STATS., Altec was entitled to treat Equivest's pledge of plaintiffs' stock as a right of a registered owner. As long as Equivest was the registered owner of plaintiffs' stock and Altec proceeded in accordance with § 408.207(1), Altec did not have a fiduciary duty to the plaintiffs.

■

Plaintiffs claim that Altec's "eleventh hour" reliance on § 408.207(1), STATS., and *Kerrigan v. American Orthodontics Corp.,* 960 F.2d 43, "demonstrates the inconsistency of Altec's position." Plaintiffs refer to the fact that Altec first advanced this reliance at oral argument. We do not consider Altec's argument "inconsistent," merely tardy. However, plaintiffs have not been denied the opportunity to respond to Altec's "eleventh hour" reliance on the Uniform Commercial Code. We also conclude that plaintiffs' agreement to address the application of § 408.207(1) moots any argu-

ment that Altec did not plead the statute as an affirmative defense. *See* EGON GUTTMAN, MODERN SECURITIES TRANSFERS ¶ 11.01 n.1 (3d ed. 1987). Further, this issue was not raised or briefed.

## PLAINTIFFS' REGISTERED OWNER CLAIM

In addition to their argument that Altec has treated them as shareholders, plaintiffs argue that they were in fact the registered owners of their stock. Plaintiffs do not claim that they presented the post-Subchapter "S" stock certificates to Altec for registration. They claim, however, that Altec made an admission in discovery that these stock certificates were registered. In their request for protection of documents, plaintiffs required Altec to "[p]roduce a copy of all Altec stock certificates *registered* . . . ." (Emphasis added.) The response by Altec's president was, "See Exhibit 4." Exhibit 4 includes the stock certificates issued but not delivered to plaintiffs to effect the Subchapter "S" election.

Altec concedes that new stock certificates in the names of the plaintiffs were prepared when the corporation elected Subchapter "S" status. Altec points out, however, that the stock certificates delivered in response to plaintiffs' demand for production were the certificates being held for them, not stock certificates registered with Altec. Plaintiffs concede that they were never in possession of these certificates. "[D]ue presentment" would have had to have been made by someone other than plaintiffs, presumably Altec. However, there is no statutory authority for the issuer to make the "due presentment" required by § 408.207(1), STATS., of securities it has issued. Nor do plaintiffs claim that they authorized Altec to register their certif-

icates. The purchaser of the registered securities may have good reasons for not wanting his or her stock registered.

Altec argues that obtaining copies of undelivered stock certificates in discovery is not the same as obtaining stock certificates through issuance and delivery by the issuer. We agree. Because the result of this lawsuit hinged on whether plaintiffs were owners of Altec securities in registered form, they had a duty to rebut Altec's *prima facie* case by evidence easily obtainable. They did not do so. We reject their reliance on their own self-serving request for production. We therefore affirm the summary judgment.

*By the Court.*—Order affirmed.